**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GEORGETOWN DRESS CORPORATION, Respondent.**

No. 75–1523.

United States Court of Appeals, Fourth Circuit.

Argued March 2, 1976.
Decided July 12, 1976.

---

Thomas A. Woodley, Washington, D.C. (John H. Ferguson, John C. Miller, Acting Gen. Counsel, John S. Irving Jr., Deputy Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., on brief), for petitioner.

Warren M. Davison, Washington, D.C. (Earle K. Shawe, Leslie R. Stellman, Shawe & Rosenthal, Baltimore, Md., on brief), for respondent.

Before WINTER, RUSSELL and WIDENER, Circuit Judges.

WINTER, Circuit Judge:

The Board's petition to enforce its bargaining order, based upon its finding that Georgetown Dress Corporation (Georgetown) violated §§ 8(a)(5) and (1) of the Act by refusing to bargain, raises the principal question of the validity of a representation election, held February 15, 1973. In that election, the union prevailed by a vote of 184 to 105; and, after Georgetown's objections to the validity of the election were overruled, the union was certified as the bargaining representative. Georgetown concedes its refusal to bargain but maintains that the order should not be enforced because (a) substantial evidence was lacking to support the Board's conclusion that when Georgetown sought to have the election voided, it failed to prove that the union, its agents, officers and representatives had created an atmosphere of fear and coercion which made a fair election impossible, (b) the administrative law judge and the Board improperly declined to receive admissible subjective evidence of threats of reactions to economic reprisal made by union agents against employees who were eligible to vote in the election, and (c) the Board improperly voided a prior election which, if valid, would have prevented the February 15, 1973 election from being held.

We decline to enforce the order because we think the record contains substantial

evidence of specific coercion practiced by the union, its agents, officers and representatives, in a generally coercive atmosphere. Thus, the Board's finding that there was a fair election cannot stand.[1] In view of this conclusion, we find it unnecessary to consider the evidentiary rulings of the Board and the administrative law judge.

## I.

■ The February 15, 1973 election was preceded by an election held August 24, 1971, which the union lost by a vote of 153 to 83. On a complaint of the union, the earlier election was ultimately voided because of the Board's finding that Georgetown violated § 8(a)(1) of the Act by interrogation of employees, a supervisor's harassment of an employee, and certain speeches to employees made by Georgetown's assistant plant manager in the weeks preceding the election. Although Georgetown seeks now to contest the correctness of this adjudication, we think that substantial evidence supported the Board's conclusions and that it was proper for the Board to set this election aside. Thus, the holding of the August 24, 1971 election was no impediment to the holding of the February 15, 1973 election.

## II.

Before us, the validity of the February 15, 1973 election turns primarily on the question of whether the members of the In-Plant Organizing Committee (hereafter the "committee") were agents of the union or whether they were mere adherents to the union cause. The question is crucial because the record reflects substantial pro-un-

ion coercion which, if attributable to the union, unquestionably destroyed the "laboratory conditions" under which the election should have been conducted and unquestionably stifled the free exchange of ideas on unionization among the employees. We need not recite all of the evidence; a few examples of the misconduct which the administrative law judge found had been committed by members of the committee will suffice.

Prior to a company-arranged meeting, Louis Herman produced a long knife in front of other employees and threatened violence at the meeting. He also told an employee that if employees did not support the union they might find sugar in their gas tanks. Lou Lambert threatened an employee that she would lose her job if she failed to support the union.[2] Gertrude Hudson promised employees higher wages and better benefits for all if the union were victorious and threatened that the best jobs would go to union supporters.[3] Gertrude Hudson warned employees that notes were being kept on what they were saying about the union and that the notes would be turned over to the union. Indeed, she hovered around employees and took notes on what was said about the union; and she was present at the polls as a union election observer when employees were voting. Burnett Johnson[4] attended an assembly of approximately 300 employees who were hearing a company talk on the forthcoming election and interrupted the speaker, forcing a confrontation. When a company supervisor approached Johnson in order to request that he remain silent, statements were made that there would be bloodshed if Johnson were touched.

1. Throughout the proceedings, the Board adopted the findings and recommendations of the administrative law judge. In this opinion, reference will be made to the findings of the administrative law judge. It should be remembered that they were adopted by the Board.

2. The evidence on this threat was disputed. Although the administrative law judge purported to credit Lambert's denial that she made the threat, he later treated the threat as if she had made it.

3. Gertrude Hudson denied making this threat. The administrative law judge made no credibility finding, but he discredited Hudson in other denials.

4. Johnson denied that he was a member of the committee, but the literature prepared by the professional union organizer listed him as such. The administrative law judge made no finding on this issue.

The campaign was also marred by other incidents which, although not attributable to the committee, contributed to an atmosphere which magnified the potential coercive effect of committee members' actions. Some employees were threatened with job loss; others were told that they would be beaten up if they crossed picket lines which could be set up in the event of a hypothetical strike by the union. The threat of placing sugar in their gas tank was made to others. An anonymous phone call was made to the wife of a vociferous anti-union employee threatening her husband's life; an anonymous note was attached to an employee's timecard threatening her with death; and graffiti was scrawled in the ladies' restroom threatening an anti-union employee with murder.

The impact of threats from identifiable and unidentifiable sources was exacerbated by the nature of the Georgetown plant itself. Georgetown is the principal employer in Georgetown, South Carolina, a small seacoast town where alternative or comparable places of employment are difficult if not impossible to find. Under such circumstances, employees would be prone to take any threat to their work situation very seriously. This heightened sensitivity is manifested by the workers' reactions to the series of incidents in this case; there was proof that attendance at the company-called meetings during the organizational campaign was very poor, and this constitutes some evidence that pro-union coercive acts and statements had their intended effect.

■ The administrative law judge ruled that under applicable legal standards the misconduct of members of the committee was not chargeable to the union. He went further and ruled that the improper conduct which had occurred "was not sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representative impossible." He added that "[t]he record reflects a feeling of tension among the employees which I believe is typical of a hard-fought campaign. It was the second

campaign and feelings were strong, yet when one examines closely what happened one sees that in the final analysis nothing did happen." The latter statement implicitly reflects a misunderstanding of the applicable law. A union can be guilty of a violation of § 8(b)(1) on the basis of threats alone, without actual acts of physical violence or destruction of property, just as the statute and cases establish that an employer can be guilty of a violation of § 8(a)(1) without actual bloodshed or the destruction of property. A fortiori these principles apply in the context of a challenge to an election. Indeed, if laboratory conditions have been destroyed, an election can be set aside even if the alleged misconduct does not rise to the level of an unfair labor practice under the Labor Management Relations Act. NLRB v. Clearfield Cheese Co., 322 F.2d 89 (3 Cir. 1963).

■ However, in determining whether an election is to be set aside, less weight is to be accorded to conduct which is attributable to neither the employer nor the union, but rather to individual employees. Orleans Mfg. Co., 120 N.L.R.B. 630, 633 (1958); see Intertype Co. v. NLRB, 401 F.2d 41, 46 (4 Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969). We think that, in the context of this case, if the conduct of the members of the committee was attributable to the union, then the election cannot stand. We now turn to the question of whether such attribution is proper in this case.

### III.

The administrative law judge found, with respect to the committee:

In conducting its organizational campaign, the Union relied not only on agents who are in its employ, but also on employees who were formed into an In-plant Organizing Committee. This committee had no formal structure, and membership was open to any employee willing to be known as a member of the committee and to work to enlist support for the Union. Committee members were not paid for any of their services

which consisted of soliciting employees to sign authorization cards, to attend Union meetings, or to support and vote for the Union. This activity occurred at the plant, but committee members also visited the homes of fellow employees. (None of the alleged unlawful activity occurred on home visits.) Committee members received no expense payments from the Union for any of their activities, but did meet with the Union representatives on occasions when meals were served and paid for by the Union representative.

Certain employees who were members of the committee were known to be such among employees at the plant, and, on at least two occasions, notices were handed out to employees inviting them to Union meetings on which appeared the following:

Important to attend
In-Plant Organizing
Committee I.L.G.W.U.

There is record support for these findings. An examination of the evidence upon which they are predicated discloses additional facts which are relevant to the issue at hand.

The committee had its inception through one of the union's professional organizers making contact with employees and advising them "if they wanted a union, I would set up a union meeting, and I would ask people to volunteer to be on the volunteer organizing committee and to sign up other people when I got the committee big enough." One of the employees testified that the organizer told the employees that if we wanted a union "we would have to sign up the plant because he didn't know the conditions and he wasn't going to be able to go in there with us and that we would have to do it for ourselves . . ." The duties of the committee included "signing cards, to ask people would they want a union in the plant of their own free will, to sign a card; and to talk with them on their own time before work, after work, downtown or whatnot." Additionally, committee members were asked to visit homes of their fellow employees and to come to union meetings. While some committee members testified that they did not pass out flyers, one member testified that she did pass out such leaflets, and another testified that she had seen other committee members passing out leaflets, "but I don't think they were assigned to it." The international union paid for the literature, some of which had "in-plant committee" printed on it. Members of the committee also helped plan union meetings.

From an examination of the record as a whole, it appears that the committee was the union's *only* in-plant contact with the workers. There is no evidence that professional organizers were in the plant. As noted above, a committee member testified that she was told by the organizer in charge that the members of the committee would be obliged to carry on the activity in the plant since he was not able to go there with us. Even in the absence of such evidence, it is unlikely that the professional organizers had access to the plant. Under *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), Georgetown was under no duty to grant such access; and given Georgetown's obvious anti-union feeling, as established by the evidence in connection with the first election as well as the evidence with regard to the later election, it seems unlikely that Georgetown would do anything more than it was required to do to facilitate organization of its employees.

The record does show that union organizers and committee members repeatedly testified that in general no expenses were paid. There were only two exceptions: organizer Hall testified that she picked up the check for dinners of committee members "once or twice" after the election and that union observers were paid for the time they spent as poll watchers at the time of the election.

The record further shows that the professional organizers instructed members of the committee not to threaten anybody and in general not to commit acts of intimidation. On the other hand, the record does *not*

contain any evidence that the union disavowed misdeeds by committee members.

When we consider and apply relevant law, we are led to conclude that the misdeeds of the committee members should be deemed misdeeds of the union under principles of agency. While it has been held that the question of whether an agency relationship exists under the Act is to be determined under the general common law of agency, *NLRB v. Local 64, Carpenters Union,* 497 F.2d 1335 (6 Cir. 1974), the common law has been liberalized by § 2(13) of the Act, which provides:

> In determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

▮ Under the common law, it is not necessary that monetary consideration flow from the principal to the agent to create a principal-agent relationship. Restatement (Second) of Agency § 16 and Comment (b). Thus, the fact that committee members who committed acts tainting the election atmosphere were volunteers is irrelevant. Further, the test of whether a principal is responsible for the illegal acts of an agent is whether those acts were "clearly inappropriate to or unforeseeable in the accomplishment of the authorized result." Restatement, supra, § 231, Comment (a). While the acts complained of were unquestionably in violation of § 8(b)(2), we cannot say that they were of a nature that a union might not well expect from unsophisticated, untrained employee volunteers to take place in a hard-fought campaign.

▮ Concededly, there is no evidence to show that the union authorized the acts of misconduct, and in that sense the acts are not attributable to the union under the principle of express authority; but we think that the union is chargeable with the misdeeds under the principle of apparent authority. The committee members in the eyes of other employees were the representatives of the union on the scene and the

union authorized them to occupy that position. While they may have exceeded their authority and, indeed, acted contrary to their express instructions, their acts were apparently within the scope of their authority, neither their misdeeds nor their authority were repudiated by the union, and their acts did not so far exceed their authority as to make obvious to the persons who were coerced and intimidated that the union would not ratify what was done. Restatement, supra, § 8, and Comments (a), (b) and (c). Especially in the light of § 2(13), which has been noted, the decisions of other courts and of the Board support the conclusion that the members of the committee were agents of the union so that their misdeeds invalidated the election. *NLRB v. Urban Telephone Co.,* 499 F.2d 239 (7 Cir. 1974); *NLRB v. Tampa Crown Distributors,* 272 F.2d 470 (5 Cir. 1959); *Local 340, International Board of Operative Potters,* 175 N.L.R.B. 756 (1969); *District 30, UMW (Terry Elkhorn Mining Co.),* 163 N.L.R.B. 562 (1967).

The Board relies heavily on *Owens-Corning Fiberglas Corp.,* 179 N.L.R.B. 219, 223 (1969), 181 N.L.R.B. 575 (1970), enforced, 435 F.2d 960 (4 Cir. 1970), to the effect that the misdeeds of rank and file employees who are not union agents should not be attributable to a union so as to invalidate an election. We do not deem the case dispositive. The Board opinion in that case did not discuss any of the duties which employees who were members of the inplant committee performed, nor whether they were the union's sole representatives in the organizational effort. Our opinion did not even mention the agency issue. Similarly, we are not persuaded that our decision in *Intertype Company v. NLRB,* 401 F.2d 41 (4 Cir. 1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969), militates against our conclusion that the misconduct of the committee members is chargeable to the union in the instant case. In *Intertype,* we did say that "[t]o hold that an improper comment by one not subject to the control of either party must necessarily invalidate a representation elec-

tion would constitute an unreasonably strict standard . . .," but we said so only with regard to an offending employee as to whom the Board had found "that [he] was not an officer of the Union or on its Organizing Committee and that the Union was not responsible for his conduct." 401 F.2d at 46.

Because we conclude that the substantial evidence and applicable law establish that conduct vitiating the fairness of the election is attributable to the union, we set aside the Board's order and deny enforcement of it.

ENFORCEMENT DENIED.