PPG INDUSTRIES, INC., Lexington Plant, Fiber Glass Division, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Teamsters Local Union No. 391, Intervenor.

No. 81–1329.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 4, 1981.

Decided Feb. 16, 1982.

Rehearing and Rehearing En Banc Denied April 26, 1982.

Richard C. Hotvedt, Washington, D.C. (Susan S. Sauntry, Donald L. Havermann, Morgan Lewis & Bockius, Washington, D.C., R. Harvey Chappell, Jr., Christian, Barton, Epps, Brent & Chappell, Richmond, Va., Hugh M. Finneran, Pittsburgh, Pa., on brief), for petitioner.

Daniel R. Pollitts, Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Washington, D.C., on brief), for respondent.

Jonathan G. Axelrod, Washington, D.C. (Hugh J. Beins, Axelrod & Osborne, P.C., Washington, D.C., on brief) for intervenor.

Before HAYNSWORTH, Senior Judge, and MURNAGHAN and CHAPMAN, Circuit Judges.

MURNAGHAN, Circuit Judge:

PPG Industries, Inc. petitions to review and set aside an order of the National Labor Relations Board to bargain with Teamsters Local 391. The Union has intervened; the NLRB cross-petitions for enforcement of its bargaining order.[1] We deny enforcement of the NLRB's order.

The Union filed its representation petition on March 27, 1978. Pursuant to a Decision and Direction of Election, the NLRB ordered a secret ballot election for July 6 and 7, 1978. The Union won the election by a vote of 698 to 639 with 24 challenged ballots and 3 void ballots.[2]

PPG timely alleged thirty-one objections to the election results. The NLRB Regional Director recommended that each objection be overruled and that the Union be certified. After receiving PPG's exceptions to the Regional Director's Supplemental Decision, the NLRB directed that a hearing be held on Objections 3 (economic coercion), 4 (threats of personal and property harm) and 29 (display of toy guns) and denied PPG's other objections.

After a nine-day hearing, the Hearing Officer made findings of fact and recommended that Objections 3, 4 and 29 be overruled. In its review of the Hearing Officer's conclusions, the NLRB adopted his findings and recommendations. The Board then certified the Union as the employees' representative.

In order to challenge the validity of the election, PPG refused to bargain with the Union. After the Union brought an unfair labor practice charge, the NLRB found that PPG had refused to bargain with the Union, in violation of Section 8(a)(5) and (1) of the National Labor Relations Act, and ordered PPG to bargain with the Union. The central question presented is whether the certification of the Union as the employees' bargaining representative was proper.

The most troublesome issue is whether the actions of the In-Plant Organizing Committee (IPOC) members claimed by PPG to constitute improper behavior should be chargeable to the Union.[3] The Hearing Officer concluded that Objections 3 and 4 should be overruled on the grounds of lack of an agency relationship between the Union and IPOC members. He noted, however, that he would recommend that the Objections be sustained if the IPOC mem-

---

1. The order was issued April 8, 1981 and is reported at 255 N.L.R.B. No. 107.

2. Approximately 1,400 workers were eligible to vote.

3. Because of the decision we have reached, it is unnecessary to address the other errors which PPG alleges.

bers involved had indeed been found to be agents of the Union.[4]

With respect to economic coercion, many PPG witnesses testified at the Hearing that IPOC members made statements threatening disparate economic treatment unless employees became members of the Union. The objectional behavior alleged in Objection 4 included five credited situations in which IPOC members threatened other employees with physical or property harm. One male IPOC member asked a female employee, who had recently revoked her union card, if she knew what happened to turncoats. He told her they "fall down the scrap shoot [sic]." Another male IPOC member threatened another female pro-company employee. He told her that "[T]here are women riding by themselves that are going to get it, you had better watch out.... [Y]ou will feel funny if you go out and your tires are cut, or your home burned." Another IPOC member identified himself as such to a pro-company employee and told the pro-company employee that "they ought to stand [him] up against the wall and shoot [him] because of [his] beliefs against the Union." Another pro-company employee testified that a pro-Union employee, believed to be an IPOC member, threatened that "if we lose this election, we're going to whip your ass." The testimony indicated that a number of supporters for both sides were in the area at the time of the threats. Finally, a male IPOC member threatened a female employee that if she crossed a picket line she would find her tires cut and her windows "busted".

The IPOC consisted of over 300 of the 1,400 employees eligible to vote. Employees became IPOC members if they signed a paper provided by the Union consenting to have their names submitted to PPG. No special insignia was worn by IPOC members to set them apart from other workers and exclusive meetings of the IPOC were not held.

IPOC members, *at the request of the Union organizer*, solicited support for the Union, not only at the plant, but also on occasion at employees' homes. IPOC members were asked to distribute Union literature (which was provided by the Union), to voice and demonstrate support for the Union, and to occasionally transport membership cards to the Union's office in Greensboro, North Carolina. Members were not, however, reimbursed for expenses nor did they receive any other remuneration from the Union. Significantly, the Union Organizer, Ms. Saporta, asked the IPOC members to be the Union's "eyes and ears" in the plant and to report on events which occurred in the plant during the election campaign.

At least seven IPOC members lent their names to a pro-Union handbill and another handbill prepared by the Union Organizer reported the activities of "our employee committee." On at least one occasion, an IPOC member relayed a message from the Union Organizer to other IPOC members directing them to refrain from distributing a particular handbill. Furthermore, on at least one occasion after some employees had sent letters to the Union attempting to withdraw their applications for membership, an IPOC member contacted them and asked them to reconsider.

An official Union representative (Ms. Saporta or another representative of the Union) was at the front gate of the plant at least once a week prior to the election and daily during the last ten days of the campaign. A handbill notified the employees

---

4. It is not surprising that the Hearing Officer's recommendations turned on the agency finding. As we noted in *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239, 1242 (4th Cir. 1976), "[I]n determining whether an election is to be set aside, less weight is to be accorded to conduct which is attributable to neither the employer nor the union, but rather to individual employees." That is not to say, however, that acts of individual employees may never suffice to void

an election. If an employee has acted on his own, and not as an agent of the union, and if the conduct "is sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representation impossible, then it will require the voiding of the election." *Methodist Home v. NLRB*, 596 F.2d 1173, 1183 (4th Cir. 1979).

that the Union had opened up a temporary office at a local motel, listed the phone number and noted that a Union representative would be there to answer questions. A Union representative was apparently present whenever handbills were distributed. There was one incident in which one employee allegedly threatened another employee in Ms. Saporta's presence. Testimony indicated that Ms. Saporta immediately disavowed that threat. Based on those facts, the Hearing Officer reached the conclusion that the IPOC members were not agents of the Union.

The seminal case in this Circuit on the agency question is *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir. 1976). The holding there virtually compelled a finding contrary to the one made by the Hearing Officer in the instant case. Apparently the Hearing Officer realized the status of *Georgetown Dress* as an obstacle to the result he desired to reach for he expressly refused to apply *Georgetown Dress* in making his determination as to whether the IPOC members were agents of the Union.[5] Yet the Hearing Officer was obliged by law to recognize that *George-*

---

5. His remarks concerning *Georgetown Dress* were as follows:

I am not satisfied that this total lack of knowledge and condonation is sufficiently dispositive of the agency issue before me for all who may review this case for I have studied and considered the opinion of the Fourth Circuit of the U.S. Court of Appeals in the case of *N.L.R.B. v. Georgetown Dress Corporation*, 537 F.2d 1239, 92 LRRM 3282 (C.A. 4, 1976) and realize that the Employer's Lexington, North Carolina plant is well within the territory which the Fourth Circuit covers. I further realize that as a hearing officer, *I am bound by Board decisions and that therefore my Report and Recommendations should be structured within the legal framework the Board has provided.* But I have devoted my legal career to protecting the right of employees to choose whether they wish to be represented by labor organizations and feel compelled to speak out on the law engendered by the *Georgetown Dress* case, a decision which establishes an agency relationship between a party and its supportive group and which I feel emasculates this freedom of choice.

First of all, I believe that the case before me is distinguishable from *Georgetown Dress.* While it is true that the Petitioner had no representative in the plant, (as was the case in *Georgetown Dress*), representatives of the Petitioner, primarily Ms. Saporta, were readily available for authoritative responses to employee questions either at the front gate of the plant, at the local office in the motel, by telephone, or at meetings. The Petitioner strongly encouraged employees to use these avenues to acquire information and forcefully and openly campaigned against threats and disparate treatment. These facts distinguish the factual situation in the *Georgetown Dress* case.

Even apart from the foregoing distinguishing factors, *I urge the Board to continue to reject, and respectfully urge the Court to reconsider, the Georgetown Dress* decision.

Esoteric agency arguments to the contrary, its result is diametrically opposed to the purposes and policies of the National Labor Relations Act. Members of committees like IPOC are not composed merely of a group of individuals supporting a labor organization or an employer but of those who are first and foremost "employees", and it is to this status that they must show their allegiance. During a representation proceeding these and other employees will decide whether they desire representation by a labor organization. This is not a decision which employees take lightly. In political elections a voter turnout of 60 percent is considered to be extraordinary. According to the Board's Annual Report for the Fiscal Year ending September 30, 1978, a voter participation of 88.5 percent was experienced nationwide and in this case voter turnout exceeded 95 percent. During organizational campaigns it is important that the issues be fully aired so that the employees may make an informed choice concerning the direction their lives will take, and must be permitted to gather facts and develop informed opinions on the issues. Obviously many of these formulations are derived from communications between and among the employees themselves and thus employees are more informed and can make an intelligent decision when they step into a Board voting booth. If *Georgetown Dress* were followed and employee members of supportive groups were made agents of the parties, there is only one practical solution. Because there is no quick and easy way to educate an employee in the field of objectionable conduct, the parties will direct their supporters not to say anything. This result is in fact occurring, and it is something which I view with horror. A rule should be fostered which encourages free-wheeling debate and a complete airing of the facts and considerations between the employees involved. Otherwise misconceptions will be taken by the employees into the voting booth.

*town Dress* was binding authority in the Fourth Circuit and as such he was not free to disregard it. Personal predilection must defer to the law if the impartiality to which the parties are entitled is to prevail.

A reading of the Hearing Officer's findings has left us with the clear impression that we are not presented with a case of two mutually independent allies supporting a common cause, the Union on the one hand, the IPOC employees on the other, but rather one group acting as an *alter ego* for the other. If we were to imagine a group performing for the employer as the IPOC here did for the Union, it strains credulity to say that we would accept a finding that the employer was not to be held accountable for what the group of workers did.[6] Whether the IPOC members represented the Union in other respects, their actions were clearly chargeable to the Union insofar as organization and campaigning were concerned.

■ In cases such as this, we do not deal with hypertechnicalities of the law of agency, but rather with the real world and the perhaps *sui generis* status enjoyed by groups such as the IPOC in representation election activities. The question is not so much one of "agency," in its purest sense as it is of whether the Union should be held accountable for the employee group's activities. *See, e.g., Methodist Home v. NLRB,* 596 F.2d 1173, 1182 (4th Cir. 1979); *NLRB v. Urban Telephone Corp.,* 499 F.2d 239, 243–44 (7th Cir. 1974). The Hearing Officer has wrongly accepted as dispositive evidence that the Union and the IPOC each did some things without engaging the help of the other as proof of non-agency.[7] A

The debate is now, and will be, heated on such an important issue. To be sure there will be exaggerations, outright prevarications and threats and possibly a fist fight or two among employees. While not approving of this conduct, I think it, and the clarifying dialogue the debate creates, to be preferable to gagging the employees who will be effected [sic] by the decision which they collectively will make. The Board can effectively police the conduct of the parties' representatives but I seriously doubt that a valid election could be conducted under the rule expressed in *Georgetown Dress.* In short, we must not permit the laboratory conditions standard for objectionable conduct to be influenced by the antiseptic, and sometimes anesthetic, atmosphere of the Board office or the courtroom. We must encourage employees to take positions, to speak out freely on the issue, to vent their misconceptions and hopefully receive corrective input, and to support the party of their choice. The freedom of choice is what a representation proceeding is all about and is crucial to the effective administration of the policies and purposes of the National Labor Relations Act.

Joint App. at 108–110 (Footnotes deleted) (Emphasis added).

6. Suppose there had been an in-plant group of employees opposed to the union. Suppose the employer spoke of the in-plant group as "our employee committee." Consider the conclusion as to agency which would result where there had been a directive from management to in-plant committee members to refrain from distributing a handbill. What if management had requested the committee to urge support of the employer's position, not merely at the plant but also during visits to the homes of other employees, or by providing literature for in-plant committee members to distribute? Finally the suggestion of a company executive that in-plant committee members act as "eyes and ears" of the employer would have, without question, required us to conclude, regardless of any contrary "finding", that the activities of the committee were chargeable to the employer.

In perceiving the telling force of the shoe-on-the-other-foot argument, we acknowledge our debt to a past master of the device. See Rev. Sydney Smith, *The Penal Laws* :

"Any Protestant clergyman remaining in France three days, without coming to the Catholic worship, to be punished with death.... Any person converting another to the Protestant religion, to be put to death .... Any Protestant taking any office, civil or military, was compelled to abjure the Protestant religion; .... If any Protestant had a horse worth more than 100 livres, any Catholic magistrate might take it away, and search the house of the said Protestant for arms."

"Forgive, gentle reader, and gentle elector, the trifling deception I have practised upon you. This code is not a code made by French Catholics against French Protestants, but by English and Irish Protestants against English and Irish Catholics: ...."

7. From the Hearing Officer's findings:

IPOC members and, upon IPOC members' invitation, those supporting the Employer's position, pooled their resources to post a re-

person may be an agent to do some things though not an agent to do everything for a principal. We are satisfied that the Union's accountability was unambiguously made out, leaving no unresolved issue of fact for the Hearing Officer. That was likewise the thrust of *Georgetown Dress*. That is why

ward to prevent threats and violence. While this is consistant [sic] with the Petitioner's campaign position concerning threats and violence, there was no evidence to indicate that IPOC members posted this reward at the insistance [sic] of the Petitioner. To the contrary the reward, established by the employees as a group and without the endorsement of the Employer or the Petitioner, is indicative of the cohesiveness of the voting unit and an awareness of their primary and jointly held status as employees. This is an important factor in the analysis of the agency issue.

A handbill, distributed to employees by the Petitioner around April 11, 1978, contained a paragraph which reads as follows:

We did not come to you, YOU CAME TO US FOR HELP. THE EMPLOYEE IN-PLANT ORGANIZING COMMITTEE HAS GROWN TO CLOSE TO 300 MEMBERS with new employees asking to join every day. *YOU* SIGNED UP TWO–THIRDS OF YOUR FELLOW EMPLOYEES on cards asking for Union representation. No one from the Teamsters signed up a single P.P.G. employee.

While this statement is not factually accurate, it is further indicative of notification to employees of a separation between the Petitioner and IPOC. Nowhere in any of the Petitioner's literature are IPOC members authorized to speak for the Petitioner and employees were not referred to its members to get answers to their questions. To the contrary, handbills urged employees to attend Union meetings and present their questions to Ms. Saporta. One handbill notified employees that the Petitioner had opened a temporary office at a local motel, listed the phone number, and stated that a Union representative would always be there "... to answer your questions." Several other handbills notified employees of an "organizing hotline" telephone number to call to get their questions answered or were directed to speak to Ms. Saporta during handbilling sessions at the front gate. During the campaign Ms. Saporta or another representative of the Petitioner made themselves available at the front gate at least weekly and during the 10-day period prior to the election, they were present at the front gate daily. On these occasions meetings were held and employee questions were answered by the representatives.

Joint App. at 106–07 (Footnote deleted).

the Hearing Officer felt obliged to strain to circumvent it.

■ In ruling that the IPOC members were not agents of the Union, the Hearing Officer cited *the NLRB's* decision in *Georgetown Dress*,[8] a position we specifical-

8.  The Hearing Officer stated:

"*Applying the rules established by the Board to the facts presented, I find that IPOC members are not agents of the [Union].*"
Joint App. at 107. (Emphasis added).

Apart from citing Board decisions, the Hearing Officer also relied on a Seventh Circuit case, *Certain-Teed Products Corp. v. NLRB*, 562 F.2d 500 (7th Cir. 1977). In that case, the court concluded that the conduct of three members of an IPOC should not be attributed to the Union. *Id.* at 510. The composition and activities of the IPOC there were significantly different from those in the case at bar. In both cases, anyone who wished to join the IPOC could, but unlike PPG employees, *Certain-Teed* employees were not required to submit their names to the Union first. In fact, in *Certain-Teed*, the Union Organizer made it clear that the actual members of the IPOC were not known to the Union.

The Seventh Circuit emphasized that the IPOC members in *Certain-Teed* did not act as a conduit of information from the employees to the Union and vice-versa. The same cannot be said of PPG's IPOC members, the "eyes and ears" of the Union in the plant. Moreover, the IPOC at PPG was much more active and apparently more organized than their *Certain-Teed* counterparts. In other words, although the Seventh Circuit's case and ours both involve an IPOC, the relevant similarities end there.

The Seventh Circuit distinguished *Georgetown Dress* in a footnote. 562 F.2d at 510 n.5. Although the Seventh Circuit considered the determinative factor in *Georgetown Dress* to be that there was no full time professional union organizer active at the plant, *see Beaird-Poulan Division, Emerson Electric Co. v. NLRB*, 649 F.2d 589, 594 (8th Cir. 1981) (reading the determinative factor in *Georgetown Dress* to be the lack of a professional organizer on the scene), the *Georgetown Dress* holding should not be so limited. Although the absence of a professional union organizer at the plant was a factor in our decision in *Georgetown Dress*, we did not intend the finding of agency to be restricted solely to situations in which that criterion is met. Every case must be determined under the totality of the circumstances and no one factor is necessarily determinative. The final inquiry is always whether the amount of association between the Union and the IPOC is significant enough to justify charging the Union with the conduct.

ly rejected in denying enforcement of the NLRB's order in *Georgetown Dress*. Disdain of the Hearing Officer for, and his intent to disregard our decision in *Georgetown Dress*, are evident in his three page polemic criticizing that decision. Stating that he was following the *NLRB's* position, the Hearing Officer urged the NLRB to continue to reject, and requested that this Court reconsider the decision in *Georgetown Dress*.[9]

As the Fifth Circuit has stated in a similar situation:

> Of course, the Administrative Law Judge, as an officer of the Government, tries cases not only for the Board, but also for labor and management and the courts. He inferred by the above statement that he would not follow the decisions of this Court. He knows full well that we are authorized and required to review his decision in any case he tries in this Circuit, if adopted by the Board and if there is an appeal, and that, if such decision is not in accord with the opinions of this Court, the decision will be reversed and enforcement denied.

*Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1252 (5th Cir. 1978).

The Hearing Officer's feeble attempt to distinguish *Georgetown Dress* does not vitiate his obviously improper attitude. Moreover, the NLRB, by agreeing with the Hearing Officer's determination, and expressing no discontent with the *Georgetown Dress* decision,[10] did not disassociate itself from the Hearing Officer's discussion of *Georgetown Dress*.[11]

The Hearing Officer's incapacity to make objective findings is manifest. Nothing done by the NLRB served to remedy the improper behavior of the Hearing Officer. The findings that there was a fair election cannot stand. We, accordingly, deny enforcement of the bargaining order.

ENFORCEMENT DENIED.

---

Moreover, the telling distinguishing feature of the case at bar vis-a-vis *Certain-Teed* is that, in *Certain-Teed*, there was not the evidence of strong Hearing Officer partiality, so destructive of any validity otherwise to be accorded his decision, which derived from his blatant disregard of binding circuit precedent.

9. We acknowledge the deference due to the NLRB and its Hearing Officers when reviewing their credibility determinations and findings of fact. We cannot, however, defer to a legal determination which flouts our previous statements on the law governing whether a group of pro-union employees will be considered an agent of the Union. It is the duty of the NLRB to apply the law of the Circuit. *See, e.g., Ithaca College v. NLRB*, 623 F.2d 224, 228–29 (2d Cir. 1980), *cert. denied*, 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980) ("[W]e do not expect the Board [or its Hearing Officer] or any other litigant to rejoice in all the opinions of this Court. When it disagrees in a particular

case, it should seek review in the Supreme Court.... Absent reversal, that decision is the law which the Board [and its Hearing Officers] must follow."); *Allegheny General Hospital v. NLRB*, 608 F.2d 965 (3d Cir. 1979).

10. The Board, far from disapproving the improper course adopted by the Hearing Officer, contented itself with the following brief observation: "In agreeing with the Hearing Officer's agency determination, we find it unnecessary to adopt his discussion of *N.L.R.B. v. Georgetown Dress Corporation*, 537 F.2d 1239 (C.A. 4, 1976)."

11. The attempt of the NLRB to have its cake and eat it too, with a nod toward the niceties by disavowing an intention to refuse to follow binding authority, but then taking an action accomplishing that very result, did not correct the manifest error.