**OVERNITE TRANSPORTATION CO.,**
Petitioner/Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent/Cross–Petitioner,

and

Teamsters "General" Local Union No. 200, Respondent/Intervenor.

Nos. 95–3711, 95–3991.

United States Court of Appeals, Seventh Circuit.

Argued May 28, 1996.

Decided Jan. 9, 1997.

Jeffrey L. Madoff (argued), Christopher A. Johlie, Matkov, Salzman, Madoff & Gunn, Chicago. IL, for Overnite Transp. Co.

Aileen A. Armstrong, John J. Toner, N.L.R.B., Washington, DC, Philip E. Bloedorn, N.L.R.B., Milwaukee, WI, for N.L.R.B. in No. 95-3711.

Scott D. Soldon, Naomi E. Soldon (argued), Previant, Goldberg, Uelmen, Gratz, Miller & Bruegeman, Milwaukee, WI, for Teamsters "General" Local Union No. 200.

Aileen A. Armstrong, Margaret Gaines Neigus, Daniel J. Michalski (argued), John J. Toner, N.L.R.B., Washington, DC, Philip E. Bloedorn, N.L.R.B., Milwaukee, WI, for N.L.R.B. in No. 95-3991.

Before CUMMINGS, ESCHBACH, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Partying, the sounds of air-horns, signs, and photography were the backdrop for the election on March 6, 1995, at which the employees of Overnite Transportation Co. de-

cided, by a 41–22 vote, to have Teamsters "General" Local Union No. 200 ("Local 200") represent them. After the National Labor Relations Board certified the union as the exclusive collective bargaining representative for "all full-time and regular part-time dock workers, city drivers, road drivers, yard jockeys and mechanics employed by Overnite," Overnite refused to bargain, claiming that the activities surrounding the election destroyed "laboratory conditions" and deprived the employees of a free choice in the election. The Board rejected those claims and found that Overnite's refusal to bargain violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1). Overnite has petitioned to have the order set aside, and the Board has cross-petitioned for its enforcement. We conclude that the Board's order is supported by substantial evidence in the record and should be enforced.

## I

The Overnite trucking terminal is located on South 13th Street in Milwaukee, Wisconsin. Thirteenth Street is a major thoroughfare, with four traffic lanes and two parking lanes. A strip of grass about 8 to 10 feet wide runs in front of the terminal, separating the curb from the parking lot in front of the building. The terminal building itself is set back some 150 to 200 feet from 13th Street. Trucks enter using the south driveway, and they proceed to the loading dock on the north side of the terminal, from which they then exit using the north driveway.

On the two Thursdays preceding the March 6 election, 7 to 10 pro-union demonstrators campaigned on the grassy area in front of Overnite's terminal. Included in this group were International Union Representative William D. Basham and volunteer organizer Scott Gouthro, an employee of Consolidated Freightways and a member of Local 200. Union organizer Darryl Connell had described the Overnite organizing campaign as "a big happening in the City of Milwaukee," and the union publicized the event with fliers about the election from January until the date of the vote. The campaigners during the pre-election period spoke with employees as they entered and left the premises, gave them literature, carried signs urging a "yes" vote, and took photographs of employees entering and leaving the building.

On election day, the supporters increased in number and in volume. They began assembling on the snow-covered area in front of Overnite at about 6:00 a.m. By 8:30 a.m., the numbers reached about 30 to 35, which was the average throughout the day, although the high point may have been as many as 70 supporters. Some of them carried signs saying "Local 200" and "Vote Yes," and there were 3 to 5 larger plywood signs planted in the snow advising employees to "Vote Yes, Teamsters 200." Supporters shook hands with truck drivers who had their windows down as they entered and left Overnite by the south and north driveways. Some enthusiasts jumped up onto the running boards of the trucks to speak briefly to the drivers.

During the day, both still and video photography took place. Basham and Connell took 26 photographs altogether; nineteen were of union supporters, while others were posed shots with pro-union Overnite employees. Photographs were also taken of the banners and signs at the front of the facility. In addition, Gouthro shot a 35–minute video of the outdoor gathering, at the request of Overnite employee Cecil Koester, one of the union organizers at the company. (Koester was concerned that he would have to miss the events due to his work.) No one told Gouthro whom or what to shoot. The majority of the video is of pro-union employees, union supporters, and Overnite truck drivers. After the election, Gouthro gave Connell a copy of the tape at Connell's request.

Throughout the day, truckers blew their air horns as they passed Overnite. Several union and non-union trucking companies are located near 13th Street, and many of their drivers routinely travel on 13th Street. On election day, the traffic was even heavier, thanks in part to the press coverage of the election and a widely distributed union flyer that said: "RALLY—We urge all our union brothers and sisters to come out in support of the Overnite workers on election day." The union also telephoned people notifying

them of the election and telling them it would appreciate their (undefined) support.

What impact, if any, did this have on the election itself? The activity, as noted, occurred either on the strip between the street and the parking lot, or at the entrances or exits to the terminal facility, and it lasted all day long. The polling hours ran from 8:00 to 10:00 a.m., and again from 8:00 to 10:00 p.m. The voting area was in Overnite's lunchroom, which was located in the lower level of the terminal. Overnite itself describes the room as a 15 foot by 30 foot concrete block room with two small windows located at the top of the north and west walls. At no time did any union supporter come within 150 feet of the polling area, and none of the outside activities was visible from the lunchroom. The air-horn blasts from passing trucks were, however, audible: Operations Manager Scott Simons testified that he heard about 100 blasts throughout the day, the majority of which were during the morning polling session. Peter Kossow, Overnite's election observer, testified that he heard about 10 to 15 blasts during the polling sessions, again with the majority in the morning. No employee testified that he was bothered by outside noise while casting a ballot. As noted above, the final tally of votes showed a wide margin in favor of the union, which won by a vote of 41 to 22, with 5 challenged ballots.

## II

On March 13, 1995, Overnite filed objections to the election. It claimed that the union had "intimidated and harassed voting unit employees, thereby contributing to a general atmosphere of surveillance, coercion, intimidation, and harassment disruptive of laboratory conditions...." A hearing followed on April 7 and 10, 1995. In a report dated May 8, 1995, the hearing officer recommended that the Board overrule Overnite's objections and certify the union as the exclusive bargaining representative. Overnite filed exceptions to her report, but on August 14, 1995, the Board rejected those exceptions and certified the union as the hearing officer had recommended. Shortly thereafter, it rejected Overnite's motion to reconsider its decision. Overnite then refused to bargain,

again citing its objections to the conduct of the election, which prompted the union to file the unfair labor practice charges before us now. In an order of November 8, 1995, the Board granted the General Counsel's motion for summary judgment, finding that Overnite offered nothing new or persuasive that would require reexamination of the certification decision, and thus that it had violated §§ 8(a)(5) and (1) of the Act. The Board's order requires Overnite to cease and desist from engaging in the unfair labor practices, and it requires Overnite to bargain with the union upon request, embody any understanding in a signed agreement, furnish the union with requested information, and post an appropriate notice.

## III

■ Our review of the Board's determination is deferential. As we recently noted, "the results of a Board-supervised and certified election are presumptively valid," and "we are obligated to affirm the NLRB's findings of fact and its applications of law to fact if they are supported by substantial evidence on the record considered as a whole." *Uniroyal Technology Corp. v. NLRB*, 98 F.3d 993, 997–98 (7th Cir.1996) (citations omitted); see also *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *K–Mart Corp. v. NLRB*, 62 F.3d 209, 212 (7th Cir.1995).

■ In an election case like this one, one of the goals is to create an environment in which the "final minutes before an employee casts his vote [are] his own, as free from interference as possible." *Milchem, Inc.*, 170 NLRB 362 (1968); *NLRB v. WFMT*, 997 F.2d 269, 274–75 (7th Cir.1993). When a party objects to election conduct, the question before the Board is whether "the electioneering activity substantially impaired the exercise of free choice so as to require the holding of a new election." *NLRB v. Del Rey Tortilleria, Inc.*, 823 F.2d 1135, 1140 (7th Cir.1987) (citations omitted). This is the light in which the phrase "laboratory conditions" must be understood: as this court pointed out in *NLRB v. Precise Castings, Inc.*, 915 F.2d 1160, 1162 (7th Cir.1990), the key question is whether the procedures suf-

ficed to protect the employees' right to choose. See also *NLRB v. Arthur Sarnow Candy Co.*, 40 F.3d 552, 559 (2d Cir.1994) ("the idea of laboratory conditions must be realistically applied"); *NLRB v. McCarty Farms, Inc.*, 24 F.3d 725, 728 n. 2 (5th Cir. 1994) ("[a]lthough we apply the 'laboratory conditions' test, 'we recognize that clinical asepsis is an unattainable goal in the real world of union organizational efforts' "). Our task here is thus to decide whether the Board's conclusion that the electioneering activity did not substantially impair the employees' exercise of free choice was supported by substantial evidence.

▉ As a preliminary matter, we must resolve an additional standard of review issue: was the conduct in question that of union agents, or merely that of rank-and-file employees? When the union itself engages in misconduct, the Board will overturn an election if the conduct "interfered with the employees' exercise of free choice to such an extent that [it] materially affected the results of the election." *NLRB v. Chicago Tribune Co.*, 943 F.2d 791, 794 (7th Cir.1991). If, on the other hand, the objectionable conduct was undertaken by someone who is not a union agent or representative, the Board will overturn the election only if the conduct "created such an atmosphere of fear and reprisal that the rational, uncoerced selection of a bargaining representative was rendered impossible." *Tuf–Flex Glass v. NLRB*, 715 F.2d 291, 296 (7th Cir.1983).

▉ The question whether an employee is an agent of the union is very fact-specific, as we noted in *Uniroyal*. 98 F.3d at 1000. See also *Kux Manufacturing Co. v. NLRB*, 890 F.2d 804, 809 (6th Cir.1989). Where, as here, the Board expressly considers the question whether an individual is an agent of the union or a third party, deference to its findings is especially appropriate. Overnite argues expansively that virtually all of the demonstrators, truck drivers, and other participants in the festivities of March 6 must be considered as union agents, because they responded to the union's flyers and other invitations to express their support for it. It also argues that Gouthro in particular was

acting as a union agent when he shot his 35-minute videotape.

▉ A union may create an agency relationship either by directly designating someone to be its agent (*i.e.* granting "actual authority") or by taking steps that lead third persons reasonably to believe that the putative agent was authorized to take certain actions (*i.e.* allowing "apparent authority" to exist). *Tuf–Flex Glass*, 715 F.2d at 296; *NLRB v. Truck Drivers Local Union No. 449*, 728 F.2d 80, 86 (2d Cir.1984); *NLRB v. L· & J Equipment Co., Inc.*, 745 F.2d 224, 232–33 (3rd Cir.1984); *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239, 1244 (4th Cir. 1976). See also Restatement (Second) of Agency §§ 26, 27. An individual's unilateral claim to be acting as the union's representative is not enough to create the agency relationship; the union must act somehow either to create actual or apparent authority, or to ratify the individual's actions. See *Tuf–Flex Glass*, 715 F.2d at·296. In *Uniroyal*, we looked to factors such as whether the union had paid for any of the alleged agent's activities, whether other employees thought the individual was a union agent, whether the individual had substantial union responsibilities, and whether the union had otherwise manifested an intent to have the person act on its behalf. 98 F.3d at 999–1000. Similarly, we have also considered whether the alleged agents held positions with the union, received any pay from the union, performed any functions at union meetings, or were authorized to speak or act on the union's behalf. *Certain–Teed Products Corp. v. NLRB*, 562 F.2d 500, 510 (7th Cir.1977).

▉ Here, Overnite argues that the union's flyers inviting people to the March 6 rally, its telephone calls, and its other "open-ended, unqualified invitation[s] for support" were enough to make every person who showed up on 13th Street on election' day agents of the union. It also suggests that the gathering on 13th Street constituted some kind of picket line, which it contends also makes the union responsible for everyone's actions. The union responds that the activities in question were electioneering, not picketing, and that its only role was to encourage others to show support for the union

side. Such a limited role, it argues, is not enough to convert the supporters into union agents.

In our view, the union's efforts to pump up the electorate and inspire enthusiasm for the union cause did not transform the assorted supporters and revelers who spent all or part of the day in front of Overnite's terminal into union agents. The union's actions were notable not for their express direction of those persons' actions, but for their passivity. It never specified what kind of support it was looking for, nor did it assign particular responsibilities to each of the many individuals who participated in the day's demonstration. This is therefore not like *PPG Industries, Inc. v. NLRB*, 671 F.2d 817 (4th Cir.1982), where a union was held accountable for the actions of members of an "in-plant organizing committee." In *PPG Industries*, the union organizer had explicitly asked the committee members to solicit support, distribute union literature, and be the union's "eyes and ears in the plant," reporting to the union about events occurring inside the plant during the election campaign. *Id.* at 819. Similarly, in *NLRB v. Urban Telephone Corporation*, 499 F.2d 239 (7th Cir.1974), the person held to be an agent of the union served as a conduit of information between the employees and the union and had been specifically selected by the union as one of its three "contact men." *Id.* at 241, 243. Here, in contrast, the union's organizer gave no instructions to the union supporters nor were they the union's chosen conduits of information. Furthermore, there is no evidence that the union's actions created the impression that the 13th Street crowd and the truckers were acting as union representatives or agents. Overnite did not introduce any testimony from its own employees about the impression they had of the election day activities. The hearing officer's conclusion, which the Board accepted, that the group were nothing more than boisterous union supporters and sympathizers finds ample support in the record.

■ Perhaps recognizing the weakness of its general argument about agency, Overnite also argues more specifically that Gouthro acted as a union agent when he made the 35–minute videotape. It notes that Gouthro was a volunteer organizer for Local 200 and that he was present on March 6 because the union had asked him to be there. When he arrived, he showed his video camera to Basham, the International's representative. Basham asked him what he planned to do with the camera, and when Gouthro replied that he planned to shoot footage of the election day events, Basham replied that he thought that was a fine idea. Basham and other union officials posed for the camera during the day. After the vote, Connell asked for a copy of the video and kept it in the union files. On the audio track of the video, a voice that may or may not be Gouthro's (it could not be conclusively identified at the hearing) comments that the tape was going to be used for the International in future votes at Overnite. Taken as a whole, Overnite insists that these facts permit only the conclusion that Gouthro was a union agent.

The hearing officer thought otherwise. She found it significant that the idea of bringing the video camera to Overnite's premises was Gouthro's own, not the union's. Basham's comment of approval to Gouthro was merely an acknowledgment that Gouthro's idea was a good one. Finally, she was similarly unimpressed with Overnite's arguments about Gouthro's actions in handing out literature a few times at the facility or his status as a volunteer organizer.

We find the record clear that Gouthro was not an actual agent of the union, but the question of apparent authority requires more attention. On the one hand, Overnite employees would have observed that Gouthro was taping prounion supporters, rather than pro-management supporters, and someone's voice—perhaps his—is heard on the tape telling people that it was going to go to the International. Furthermore, Overnite's employees would have known that Gouthro was a volunteer organizer for the union by the time of election day. On the other hand, the hearing officer reasonably could have concluded that Basham's comment of approval, and the actions of a few union organizers posing for the camera, fell short of the type of action that would have led outsiders reasonably to believe that Gouthro was a union

agent. In *Millard Processing Services, Inc. v. NLRB*, 2 F.3d 258 (8th Cir.1993), the court found no agency had arisen where the person who taped union organizers handing out literature to employees wore a "Union, Yes" hat, but he told those who inquired that he worked for a local cable station. In *Tuf-Flex Glass*, an employee who was concededly an enthusiastic union supporter was not an agent where the employees knew who the designated union representative was, and where the union did not promise the employee any benefits for his organizing efforts. In *Certain–Teed Products*, three members of the in-plant organizing committee—one of whom was an ardent enough union supporter to be subsequently elected president of the union—were not agents where they held no positions with the union, received no gifts or remuneration from the union, and performed no function at union meetings. Bearing in mind the deferential standard of review we are obliged to apply, we conclude that the hearing officer's decision that Gouthro was neither an actual nor an apparent agent was supported by substantial evidence in the record.

■ On the merits, therefore, we must decide only if the conduct "created such an atmosphere of fear and reprisal that the rational, uncoerced selection of a bargaining representative was rendered impossible." *Tuf–Flex Glass*, 715 F.2d at 296. Again, this is a fact-specific inquiry, for which the substantial evidence rule is particularly important. The electioneering here took place well away from the protected zone within 150 feet of the polls; indeed, it was invisible from the polls given the configuration of the lunchroom. See *Del Rey*, 823 F.2d at 1140–41 (contact between union representative and employees permissible where limited to area outside of no-electioneering zone); *Boston Insulated Wire & Cable Systems v. NLRB*, 703 F.2d 876, 882 (5th Cir.1983) (permissible for union to pass out literature when outside of no-electioneering zone). Most of the activity took the form of generalized support, such as signs, drive-bys with blowing air-horns, and flag waving, rather than direct conversation. The direct conversations that occurred with the entering and leaving drivers were very brief, lasting no more than fifteen seconds or so, and took place well away from the polls. Finally, Overnite presented no testimony that any employee felt intimidated by the 13th Street crowd or felt distracted in voting by hearing air-horns from the street. In the absence of this kind of evidence, we are unable to say that the hearing officer's conclusion that the environment was not unduly coercive lacks support in the record. See *Milchem, supra; Del Rey, supra*. Indeed, even if we had found above that the demonstrators were all agents of the union, we would still conclude that the record does not show that the conduct "interfered with the employees' exercise of free choice to such an extent that [it] materially affected the results of the election." *Chicago Tribune*, 943 F.2d at 794. This was not a close election; the activities were well away from the polling place; and no one complained. Under either standard, therefore, the 13th Street activities provide no basis for setting aside this election.

■ Finally, Overnite argues that both the still photography and the videotaping amounted to campaign surveillance that was threatening enough to interfere with the election. Here again, context is crucial. We do not have a case where the photographers target anti-union activists with express or implicit threats that they will rue the position they have taken. See *Mike Yurosek & Son, Inc.*, 292 NLRB 1074, 1989 WL 223861 (1989). It was impossible to tell outside the building or in the driveway who had voted, or what their position may have been. Most of the pictures were of the union supporters, in any event, and the drivers whose pictures were taken were all smiling or posing for the camera, with none turning away or otherwise attempting to avoid being photographed. No employee testified that the photography was at all bothersome, unlike the situation in *K–Mart Corp.*, where we remanded for the Board to address the testimony of four witnesses that union picture-taking had intimidated them—testimony that neither the hearing officer nor the Board had previously addressed. 62 F.3d at 213. With respect to the videotape, the hearing officer in the instant matter commented "[i]f a picture is worth a thousand words, a video tape speaks

volumes." None of the persons either had their pictures taken or were taped without their consent. They were willing and cooperative; nothing resembling a threat was uttered; and there was no evidence of a retaliatory motive for the video. The laughing and joking in the background indicate that the statements that the video was being taken for the International were not understood in an intimidating way by those who heard them. In short, Overnite has not shown any reason why the Board's decision that the photography here was innocuous should be overturned.

## IV

The complaints Overnite has aired in this court have now been considered by the hearing officer and the Board at the initial certification stage, and then by the Board again when Overnite refused to bargain with Local 200. The hearing officer systematically dealt with each of its objections and made findings on each one that are supported by the record. We therefore reject Overnite's challenge to the Board's order of November 8, 1995, and we grant the Board's request that the order be ENFORCED.