PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

KENTUCKY TENNESSEE CLAY
COMPANY,

*Respondent.*

No. 01-2202

On Petition for Review of an Order of the
National Labor Relations Board.
(11-CA-18941, 11-CA-18951)

Argued: May 7, 2002

Decided: July 12, 2002

Before WILLIAMS, TRAXLER, and GREGORY, Circuit Judges.

---

Enforcement denied by published opinion. Judge Traxler wrote the opinion, in which Judge Williams and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Walter Odell Lambeth, Jr., ELARBEE, THOMPSON, SAPP & WILSON, L.L.P., Atlanta, Georgia, for Respondent. Fred B. Jacob, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. **ON BRIEF:** Jeffrey S. Hiller, ELARBEE, THOMPSON, SAPP & WILSON, L.L.P., Atlanta, Georgia, for Respondent. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Acting Deputy General Counsel, John H. Ferguson, Associate

General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner.

**OPINION**

TRAXLER, Circuit Judge:

This case is before the court on the application of the National Labor Relations Board (the "Board") for enforcement of its Decision and Order requiring Kentucky Tennessee Clay Company (the "Company") to bargain with the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (the "Union") as the exclusive bargaining representative for production and maintenance employees at the Company's facility in Langley, South Carolina. The Company asserts that it need not recognize the Union because the certification election in which the Union prevailed was rendered invalid by the threatening and coercive acts of Company employees acting on behalf of the Union. We agree that the election must be invalidated and, therefore, deny the Board's petition to enforce its Decision and Order.

I.

A.

In early 1989, the Company purchased a facility in Langley, South Carolina, which was in the business of mining and processing kaolin clay. At the time, the employees at the Langley facility were represented by the Union. However, the Union was decertified by election later that same year.

In December 1999, long-time Company employee Odell Glover contacted the Union's international representative, J.C. Todd, and informed him that some of the employees at the Langley facility were interested in reorganizing the workforce. Glover had been employed at the Langley facility for 44 years and was the Company's most senior employee in Langley. He had also been very active in the

Union during its prior representation of the Langley employees, holding the offices of interim president, vice-president, shop steward, and negotiating committee member, and had worked closely with Todd during that time.

In response to Glover's call, Todd traveled to Aiken, South Carolina, in early January 2001, to meet with Glover, employee Myron Renew, and three additional employees from the facility. Todd answered questions about the organizing process during this meeting, but "told the employees that before he put any cards out or wasted any time, they must go back and talk to other employees and if they had more interest, to call." J.A. 226. Todd did not distribute any cards or literature at this meeting.

Approximately a week later, Todd spoke with either Glover or Renew and learned that employee interest seemed sufficient to proceed. Todd then took authorization cards to Glover and Renew and told them to call him after they had gotten them signed. After Glover and Renew, along with three additional employees, collected the requisite signatures, Glover contacted Todd. A meeting was scheduled for January 22, again in Aiken, for Todd to collect the signed authorization cards. Glover, Renew, and ten additional employees met with Todd on this visit.

With cards in hand, Todd petitioned the Board for a representation election on January 31, 2000. In the petition, the Union sought to represent a bargaining unit of "[a]ll full-time and regular part-time production and maintenance employees, including mining and processing employees and leadmen employed by the [Company] at its Langley, South Carolina facility." J.A. 25. Todd negotiated an election stipulation with the Company and the Board, and the election was scheduled for March 15, 2000. In the interim, Todd held three Union meetings, all of which took place in Aiken, and provided Union literature to Glover and Renew to be distributed to the facility employees. Although Glover denies having distributed the literature, Renew admits that he did so.

On March 8, 2000, one week before the scheduled election, Todd checked into a motel room in Aiken with the intention of staying until the election was held. Upon arriving, Todd again contacted Glover

and Renew, gave them his room number, and asked them to tell the other employees that he was staying in Aiken. Approximately 15 to 20 employees visited Todd at his motel room during the week.

On March 15, 2000, the Board conducted the representation election. Of the 45 eligible ballots cast, 23 were cast for the Union, 21 were cast against the Union, and one was challenged by the Union. The Company thereafter filed objections to the election with the Board, asserting that the election was invalid because the Union, through the actions of Glover and Renew, had made threatening and coercive statements to employees during the campaign, thereby interfering with their ability to exercise a free and reasoned choice in the election. The Administrative Law Judge ("ALJ") held a hearing on the Company's objections on May 4, 2000, during which the Company successfully established that Glover and Renew had indeed threatened several eligible employees with the loss of their jobs if they did not support the Union and the Union prevailed in the impending election. These threats are at the heart of the Company's claim that the election was invalid.

## B.

We begin with employee Larry Jackson, who testified that Glover telephoned him during the campaign about becoming a member of the Union. When Jackson told Glover he was not interested, Glover "changed his tone of voice and told [Jackson] that if he didn't become a union member before the union got in, . . . he could be squeezed out of his job." J.A. 231 (internal quotation marks omitted). Jackson testified that he knew Glover had a long-term association with the Union and that he believed Glover's threat. Glover admitted contacting Jackson to solicit his Union membership, but testified that when Jackson asked him what the Union was like, Glover simply told him it would take too long to explain and hung up. The hearing officer found that Glover's testimony was not credible on this matter and that Glover did threaten Jackson with the loss of his job if he did not join the Union.

Employee Gregory Keith Phillips testified that he received two threats. First, Phillips testified that Renew told him that "they'd like for [Phillips] to be a part of [the Union] with them," that they "were

remembering the guys that . . . weren't with them," and that if Phillips "wasn't with them it would be hard on [him]." J.A. 232 (internal quotation marks omitted). Phillips testified that when Glover later asked him why he was against the Union, Phillips responded that he was only against the way Renew had approached him about it. According to Phillips, Glover then replied, "Well, let me tell you something about the Union. . . . [D]o you really thin[k] you'll be able to work here when the union comes in and be able to freeload off the man who's paying the union dues. . . . [Y]ou won't be able to work here when the union comes in and you can go ask [management] what they can do to keep your job." J.A. 233 (internal quotation marks omitted).

Phillips testified that he was "highly upset" by the threats, that Glover seemed confident in his ability to make good on them, and that he believed they would try to terminate Phillips' employment if he did not support the Union. J.A. 97. Renew admitted meeting with Phillips to give him a Union card, but denied making any statements concerning what would happen to Phillips if he refused to join the Union. Glover admitted to having two conversations with Phillips before the election about the Union, but likewise denied threatening Phillips. However, the hearing officer also credited Phillips' version of the encounter with both men.

A third employee, James Walker, testified that Glover told him and three or four other employees "that if we didn't support the Union or the people that didn't support the Union, they wouldn't be working there very long. They'd see to it that they were fired or run off from the job." J.A. 236 (internal quotation marks omitted). Glover denied having any conversation with Walker prior to the election. However, the hearing officer credited Walker's statement.

Sam Jason Kirkendahl, the fourth employee credited by the hearing officer, testified that Renew spoke with him on several occasions about the Union and that, at one point, Renew told Kirkendahl that "if he did not support the union, he could be squeezed like a lemon, squeezed out of a job, while making squeezing gestures with his hands." J.A. 237-38. Kirkendahl testified that Renew also told him that "they had ways of weeding those who did not support the Union," that "they could be weeded out of their jobs," that they would "just make it hard on you so that you won't want a job," and "that [he]

would be left out in the wind" if he did not support the Union. J.A. 238 (internal quotation marks omitted). Kirkendahl likewise testified that he was concerned about the threats and, in particular, that he was concerned that "they would maybe sabotage equipment or set me up so that I would look like I had failed to perform my duties of my job and cause me to lose my job." J.A. 130. Renew admitted that he had daily contact with Kirkendahl, but denied making any threats. However, the hearing officer credited Kirkendahl's testimony.

A fifth employee, Earl Morse, also testified that Renew told him "that we will be squeezed like a lemon if you don't support the union" and that Renew told him on a separate occasion, "that once the wagon went by and I wasn't on the wagon, I'd be left behind, hanging in the wind. The wagon is here, you've got to get on or you're left." J.A. 238 (internal quotation marks omitted). Renew denied making either statement. The hearing officer credited Morse's testimony regarding both incidents, but concluded that the statements were not threatening or coercive.[1]

### C.

At the conclusion of the hearing on the ballot challenges, the hearing officer issued her Report and Recommendation, recommending that the Company's objections be overruled in their entirety. As noted above, the hearing officer credited the testimony of the five employee-voters over that of Renew and Glover. However, the hearing officer found that Renew and Glover's statements could not be attributed to the Union based upon principles of apparent agency, and that (with the exception of the statement made to Morse, which the hearing officer concluded was not threatening or coercive) the threats did not taint the election because the employees could not have reasonably concluded that Glover or Renew had the means to carry out the threats to terminate them. On November 2, 2000, the Board

---

[1] A number of additional alleged threats made by Glover and Renew were testified to at the hearing, which the hearing officer either did not credit as truthful or did not feel were specific enough as to details or time. Because it is unnecessary to our determination, we express no opinion as to whether the hearing officer's findings regarding these additional threats were proper.

adopted the hearing officer's findings and recommendations and certified the Union as the collective bargaining representative.

The Company, however, refused to recognize and bargain with the Union or to furnish information requested by the Union in its role as bargaining representative, prompting the Union to file an unfair labor practice charge with the Board. The Board's Acting General Counsel issued a complaint against the Company, alleging violations of § 8(a)(5) and § 8(a)(1) of the National Labor Relations Act, *see* 29 U.S.C.A. § 158(a)(1) & (a)(5) (West 1998) (the "Act").[2] In response, the Company admitted its refusal to bargain and to furnish information, but contested the validity of the Union's certification. The Board thereafter granted the Acting General Counsel's motion for summary judgment by Decision and Order. The Company was ordered, *inter alia*, to bargain on request with the Union and to furnish the Union with the requested information. The Board thereafter filed this Application for Enforcement of its Order.

## II.

## A.

The Board is vested "with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330 (1946); *see Elizabethtown Gas Co. v. NLRB*, 212 F.3d 257, 262 (4th Cir. 2000). "The results of a[n NLRB]-supervised representative election are presumptively valid," *Elizabethtown Gas*, 212 F.3d at 262 (internal quotation marks omitted), and we must uphold findings and conclusions of the Board "[s]o long

---

[2]Section 8(a)(5) of the Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees. . . ." 29 U.S.C.A. § 158(a)(5). Section 8(a)(1) of the Act makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of [their protected] rights. . . ." 29 U.S.A. § 158(a)(1). However, because an employer cannot obtain direct review of a Board's certification, a refusal to bargain is the "proper path to judicial review of the Board's election decision." *Rosslyn Concrete Constr. Co. v. NLRB*, 713 F.2d 61, 63 n.1 (4th Cir. 1983).

as the . . . decision is reasonable and based upon substantial evidence in the record considered as a whole," *id.*

Nevertheless, because the employees' right to exercise a "fair and free choice" in a representation election is the mandate, *see A.J. Tower*, 329 U.S. at 330, elections must be conducted in "laboratory conditions," free from behavior that improperly influences the outcome, *see NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239, 1242 (4th Cir. 1976). "Indeed, if laboratory conditions have been destroyed, an election can be set aside even if the alleged misconduct does not rise to the level of an unfair labor practice under the Labor Management Relations Act." *Id.*; *see also NLRB v. Urban Tel. Corp.*, 499 F.2d 239, 242 (7th Cir. 1974) ("'For conduct to warrant setting aside an election, not only must the conduct be coercive, but it must be so related to the election as to have had a probable effect upon the employees' actions at the polls.'" (quoting *NLRB v. Zelrich Co.*, 344 F.2d 1011, 1015 (5th Cir. 1965)).

In determining whether improper behavior has materially influenced the outcome of an election, the source of the behavior is an important consideration. Because "third parties are not subject to the deterrent of having an election set aside, and third party statements do not have the institutional force of statements made by the employer or the union," *NLRB v. Herbert Halperin Distr. Corp.*, 826 F.2d 287, 290 (4th Cir. 1987), it is well-settled that "[l]ess weight is accorded the comments and conduct of third parties than to those of the employer or union," *id.*; *see also Georgetown Dress*, 537 F.2d at 1242 ("[I]n determining whether an election is to be set aside, less weight is to be accorded to conduct which is attributable to neither the employer nor the union, but rather to individual employees."); *Urban Telephone*, 499 F.2d at 242 (noting that a "stricter standard" of conduct applies to the union and to the company than to third parties). Thus, an election will be set aside for improper conduct by a union or union agents when threats, acts of coercion, or other improprieties occurred and "materially affected the election results." *Herbert Halperin*, 826 F.2d at 290 (internal quotation marks omitted). However, an election will be set aside for conduct by individual employees "only if the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible

a rational uncoerced expression of choice as to bargaining representation." *Id.*

In determining whether an agency relationship exists between the employees and the Union under the Act, we apply the general common law of agency as developed by the Act. "The question is not so much one of 'agency,' in its purest sense as it is of whether the Union should be held accountable" for the employee's conduct. *PPG Indus. Inc. v. NLRB*, 671 F.2d 817, 821 (4th Cir. 1982). Thus, we have explained that "'[i]n determining whether any person is acting as an agent of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.'" *Georgetown Dress*, 537 F.2d at 1244 (quoting 29 U.S.C.A. § 152(13)). Rather, "[t]he final inquiry is always whether the amount of association between the Union and the [employee organizers] is significant enough to justify charging the Union with the conduct." *PPG Indus.*, 671 F.2d at 822-23 n.8.; *see also Methodist Home v. NLRB*, 596 F.2d 1173, 1182-83 (4th Cir. 1979).

## B.

In this case, the Board concluded that the third-party standard of conduct applied to the threats made by Glover and Renew because "the union did not delegate authority to Glover and Renew sufficient to establish that they were either agents of the Union or that they were acting with the apparent authority of the Union" during the election process. J.A. 229. More specifically, the Board found that the Union was not chargeable with the improper conduct of Glover and Renew because Todd maintained an active presence in the Union campaign, Glover and Renew were not compensated for their organizing efforts, and Todd never condoned or was aware of the improper threats made by Glover and Renew. Thus, the Board concluded, Glover and Renew were little more than enthusiastic supporters of the Union's cause. We disagree. When we apply our controlling precedents to these circumstances, we are satisfied that the amount of association between Todd, Glover, and Renew requires us to charge the Union with the coercive threats made by Glover and Renew in the workplace, and that the Board abused its discretion in ruling otherwise.

1.

First, the Board's finding that Glover and Renew should not be considered agents of the Union because Todd maintained an active presence in the campaign while Glover and Renew acted merely as unpaid, vocal supporters of the campaign is not supported by substantial evidence in the record. Todd was the only professional Union organizer having any involvement in the campaign at the Langley facility, yet he never traveled to the Langley facility or to any other place within Langley to meet with or attempt to organize the facility employees. Glover and Renew, on the other hand, were never formally identified as Union representatives or agents nor paid by the Union for their organizing efforts; yet they and a handful of other employees they recruited carried out all of the organizing efforts within the facility, often at the direct request of Todd.

Glover and Renew were instrumental in every step of the campaign process. The organizing drive was initiated by Glover contacting Todd, with whom he had a previous Union relationship. Todd, in turn, placed the lion's share of the organizing work upon Glover and Renew. At the outset, Todd refused to become directly involved until these employee-organizers demonstrated sufficient overall employee interest in the Union. And, once such interest was shown, Todd proceeded not by becoming directly involved, but by placing the burden of obtaining the requisite authorization cards squarely and exclusively on their shoulders. Todd merely collected the cards from Glover, filed the petition with the Board, and negotiated the election stipulations with management.

Todd's near exclusive reliance upon Glover and Renew to effectuate the Union organization, however, continued even after the petition was filed. Todd gave Glover and Renew the Union literature to distribute to the employees, which Renew admits having distributed, and it was Glover and Renew who spoke with the eligible employees about the Union both in the workplace and by telephone calls to their homes. Although Todd held three Union meetings during the campaign period in Aiken, he charged Glover and Renew, the Union's only conduits of information to the employees, with the task of notifying the employees of the place and time. In contrast to these highly visible activities undertaken by Glover and Renew, some at the spe-

cific direction of Todd, there was no evidence that Todd or any other professional organizer ever obtained a single signature on an authorization card, attempted to visit the facility or to speak to employees on its outskirts, handed out a single pamphlet, or attempted to initiate contact with a single employee beyond those present at the three organizational meetings.

2.

Second, the Board's conclusion that Glover and Renew were not apparent agents of the Union is inconsistent with our controlling precedents. Although the agency inquiry is always a highly fact-specific one, *see PPG Indus.*, 671 F.2d at 822-23 n.8, this court has previously set aside representation elections conducted in similar circumstances, *see PPG Indus.*, 671 F.2d at 818-22; *Georgetown Dress*, 537 F.2d at 1244-45.

In *Georgetown Dress*, several employees who had been solicited to campaign for the Union on a volunteer basis engaged in improper acts of coercion, including threatening employees with the loss of their jobs if they failed to support the union, telling employees that the best jobs would go to union supporters, and warning employees that notes were being kept on what the employees were saying about the union. *See* 537 F.2d at 1241. Despite the lack of any union authorization of these acts of misconduct, we held that the union was properly chargeable with the misdeeds under the principles of apparent authority. Like here, the professional union organizers had delegated a number of specific organizing tasks to the unpaid employee organizers, including having the authorization cards signed by the other employees, talking with the employees about the union both in the plant and outside the plant, distributing union literature, and helping to plan union meetings. *See id.* at 1243-44. In addition, these employees were the union's only in-plant contact with the other employees. *See id.* at 1243. Thus, "in the eyes of other employees," the union supporters "were the representatives of the union on the scene and the union authorized them to occupy that position." *Id.* at 1244.

In *PPG Industries*, we likewise set aside an election after holding the union responsible for the threatening acts of employees who, "*at*

*the request of the Union organizer*, solicited support for the Union
. . ., were asked to distribute Union literature (which was provided by
the Union), to voice and demonstrate support for the Union, and to
occasionally transport membership cards to the Union's office." 671
F.2d at 819. Of particular significance was the fact that the union
organizer had asked the supporters "to be the Union's 'eyes and ears'
in the plant and to report on events which occurred in the plant during
the election campaign." *Id.* at 819. And, we did so even though the
union officials in *PPG Industries* were more heavily involved and sig-
nificantly more visible to the eligible employee voters than those in
*Georgetown Dress*; the union officials in *PPG Industries* visited the
work site "at the front gate of the plant at least once a week prior to
the election and daily during the last ten days of the campaign," *id.*,
and distributed a handbill directly to employees to notify them that
union officials were available nearby to answer questions and hold
meetings. *See id.* at 819-20.

The Board's attempt to distinguish *Georgetown Dress* and *PPG
Industries* on the basis that the improper actions were taken by pro-
union employees who had been formally designated by the Union to
be an "In-Plant Organizing Committee" or "IPOC" created by the
Union does not persuade us. Although it is true that Todd did not des-
ignate Glover and Renew as an IPOC, our decisions in *Georgetown
Dress* and *PPG Industries* did not rest on the fact that the agents were
given any formal label. Glover and Renew performed functions nearly
identical to those performed by the IPOC members in *Georgetown
Dress* and *PPG Industries*, and the Union cannot escape responsibility
for the improper actions of employees which are otherwise properly
charged to it under principles of apparent authority simply by not
bestowing a formal title upon them. *See*, *e.g.*, *Urban Telephone*, 499
F.2d at 242-244 (finding that actions of a single employee were fairly
attributable to the union under agency principles even though he was
not formally designated as an agent).[3]

---

[3]The Board's attempt to analogize this case to the facts underlying our
decision in *Herbert Halperin*, 826 F.2d at 290-91, in which we held that
employees were not apparent agents of the Union, is also unavailing.
*Herbert Halperin* is readily distinguishable from *Georgetown Dress* and
*PPG Industries*, as well as from the facts in this case, because the profes-
sional union staff was heavily involved in the organizing campaign.
They, and not the employees, distributed the union's literature, con-
ducted all of the union meetings, and distributed and collected the union
authorization cards. *See Herbert Halperin*, 826 F.2d at 291.

The absence of pay or other direct benefits to Glover and Renew, although relevant to the question of agency, is similarly overemphasized. "Under the common law, it is not necessary that monetary consideration flow from the principal to the agent to create a principal-agent relationship." *Georgetown Dress*, 537 F.2d at 1244. And, of course, the Union cannot insulate itself from the actions of pro-Union employees taken on its behalf simply by not paying them.

Finally, the Board's reliance upon the fact that Todd never condoned or was even aware of the improper threats made by Glover and Renew is also misplaced. At a minimum, Todd acquiesced in and relied upon the clear leadership role assumed by Glover and Renew, yet took no steps to inform the other employees that Glover and Renew were not Union agents and were not authorized to speak on its behalf. As in *Georgetown Dress*, "neither th[e] misdeeds nor the[ ] authority [of the employees] were repudiated by the union, and their acts did not so far exceed their authority as to make obvious to the persons who were coerced and intimidated that the union would not ratify what was done." *Id.*[4] "[I]n the eyes of other employees," Glover and Renew "were the representatives of the union on the scene and the union authorized them to occupy that position." *Id.* In sum, Glover and Renew were much more than mere "leading and vocal employee union supporter[s]." J.A. 228. Todd chose to take a role of minimum involvement while allowing, and at times directing, Glover and Renew to carry on the actual organizing activities. By conducting the campaign in this fashion, Todd should have known that he would create the belief that Glover and Renew were authorized to speak and

---

[4]Glover's position only further validated this reasonable belief. Glover, the Company's most senior employee, was a long-time Union leader, and known to be so by those eligible to vote. By his own admission, he had held almost every Union office during its representation of the Langley facility employees, including shop steward, member of the negotiating committee, vice-president, and interim president. During this same time period, Todd was the Union's international representative and the person with whom Glover frequently interacted. Although only a handful of employees from that era remained at the time of this organizing campaign, we do not ignore the fact that a handful did remain, that the workforce is relatively small, and that there was substantial and undisputed evidence that Glover's relationship with the Union was widely known among the eligible employees.

act on his behalf and on the Union's behalf. Indeed, given his near lack of any participation whatsoever, he could hardly have intended any other consequence.

## C.

Having determined that Glover and Renew were apparent agents of the Union, we must next determine whether their coercive and threatening conduct during the election "destroyed the 'laboratory conditions' under which the election should have been conducted . . . and stifled the free exchange of ideas on unionization among the employees," *Georgetown Dress*, 537 F.2d at 1241, so as to "materially affect[ ] the election results," *Herbert Halperin*, 826 F.2d at 290 (internal quotation marks omitted). We are satisfied that it did.[5]

First, the Board abused its discretion in finding that the threats known to have been made by Glover and Renew were not coercive because the employees could not have reasonably believed that Glover and Renew had the means to carry out the threats. This finding was no doubt based upon the same erroneous view of the evidence which led the Board to conclude that Glover and Renew were not acting as agents of the Union in the first place and, therefore, that the standard applicable to third party conduct governed. *See Herbert Halperin*, 826 F.2d at 290 (providing that an election need only be set aside if the conduct of third parties was such that "the election was held in a general atmosphere of confusion, violence, and threats of

---

[5]After briefing, the Board moved to strike a footnote from the Company's reply brief in which the Company pointed out, as additional support on the issue of apparent authority, that Todd designated Renew to act as the Union's election observer on the day of the election. The Board argued that the Company had improperly raised this issue for the first time in a reply brief. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) ("[A]n issue first argued in a reply brief is not properly before a court of appeals."). Because Renew's alleged status as the Union's election observer was referenced in the Company's opening brief, we deny the Board's motion to strike. We note, however, that an employee's status as an election observer is only a fact to be considered; it does not automatically make him or her an agent of the Union. In this case, it only bolsters our conclusion that Renew was cloaked with the apparent authority of the Union.

violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representation" (internal quotation marks omitted)).[6] However, for the same reasons we concluded that Glover and Renew were acting with the apparent authority of the Union, and therefore that their conduct was subject to a stricter standard, we conclude that the employees reasonably believed that Glover and Renew would be able to effectuate their removal from the workplace if the Union prevailed, either by "setting them up" to be terminated by management or by making their working conditions so miserable as to force them to leave.

Second, we are satisfied that the threats had a probable and material effect upon the election results. Of the 45 eligible ballots cast during the election, 23 were cast for the Union, 21 were cast against the Union, and one was challenged by the Union. A closer election among this small workforce was not possible; coercion of a single employee sufficient to have changed his vote to one for the Union would have changed the outcome. Based solely upon those employees who came forward in the face of a Union win, the Board found that Glover and Renew had together threatened at least four eligible employees. In at least one circumstance, Glover and Renew both threatened the same employee. In another circumstance, multiple threats were made against a single employee. And, in yet another incident, the threat was made in the presence of additional employees who did not testify. There is undisputed evidence that there were eligible voters who believed the threats and believed that the pro-Union employees, even if not vested with the direct power to terminate one's employment, had the ability to effectuate the same result through indirect means.

### III.

Having concluded that the actions of Glover and Renew were coercive and attributable to the Union, and that their coercive actions had

---

[6]In view of our holding, we need not decide whether the Board reasonably found that the statements of Glover and Renew, as third-parties, did not create such a general atmosphere of fear and coercion as to render a free election impossible. *See Herbert Halperin*, 826 F.2d at 290.

a probable and material effect upon the votes of the eligible employ-ees in the election, we hold that the Board abused its discretion in overruling the Company's objections and certifying the Union. Accordingly, we set aside the Board's Decision and Order and deny enforcement of it.

*ENFORCEMENT DENIED*