**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 05-1182**

---

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

and

INTERNATIONAL BROTHERHOOD OF BOILERMAKERS,
IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND
HELPERS,

Intervenor,

versus

KENTUCKY TENNESSEE CLAY COMPANY,

Respondent.

---

On Application for Enforcement of an Order of the National Labor
Relations Board.  (11-CA-18925; 11-CA-18968)

---

Argued: February 1, 2006                    Decided: May 2, 2006

---

Before MICHAEL, SHEDD, and DUNCAN, Circuit Judges.

---

Application for enforcement granted by unpublished per curiam
opinion.

---

**ARGUED:** Raymond Lee Creasman, Jr., ELARBEE, THOMPSON, SAPP &
WILSON, L.L.P., Atlanta, Georgia, for Respondent.  Jewel Lynn Fox,
NATIONAL LABOR RELATIONS BOARD, Office of the General Counsel,

Washington, D.C., for Petitioner. Scott Louis Brown, BLAKE & UHLIG, P.A., Kansas City, Kansas, for Intervenor. **ON BRIEF:** Stanford G. Wilson, Joshua H. Viau, ELARBEE, THOMPSON, SAPP & WILSON, L.L.P., Atlanta, Georgia, for Respondent. Arthur F. Rosenfeld, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Julie B. Broido, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Petitioner. Michael J. Stapp, BLAKE & UHLIG, P.A., Kansas City, Kansas, for Intervenor.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

The National Labor Relations Board (the "Board") seeks enforcement of its Decision and Order against Kentucky-Tennessee Clay Company (the "Company"), requiring the Company, inter alia, to cease and desist from interfering with its employees in the exercise of the rights guaranteed by § 7 of the National Labor Relations Act (the "Act"), see 29 U.S.C. § 157 (1998), and to offer Patrick Scott ("Scott"), a terminated employee, immediate and full reinstatement to his former position or a substantially equivalent position. The Board bases its Order on its findings that the Company committed multiple violations of §§ 8(a)(1) and (3) of the Act. See 29 U.S.C. § 158 (1998). Because we conclude that, viewing the record as a whole, substantial evidence supports the Board's findings, we grant the application for enforcement.

I.

In January 2000, the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers and Helpers (the "Union"), seeking to represent a bargaining unit of all full-time and regular part-time production and maintenance employees at the Company's kaolin clay mining and processing facility in Langley, South Carolina, petitioned the Board for a representation election. Although the Union won, the Company challenged the

3

result, and this court invalidated the election in 2002. See NLRB v. Kentucky Tenn. Clay Co., 295 F.3d 436, 439 (4th Cir. 2002).[1]

Independent of the Company's challenge to the representation election, the General Counsel to the Board issued a consolidated complaint in May 2001, alleging that the Company had violated §§ 8(a)(1), (3) and (5) of the Act. The case was heard before an Administrative Law Judge ("ALJ"), who found that the Company had committed the alleged violations. Both the Company and the General Counsel filed exceptions to the ALJ's decision. In light of this court's decision invalidating the representation election, the Board reversed the ALJ's findings that the Company had violated § 8(a)(5) by refusing to recognize and bargain with the union, and by unilaterally changing certain terms and conditions of employment.[2] The Board affirmed, however, the ALJ's findings that the Company had violated § 8(a)(1) by threatening employees with discharge if they went on strike, creating the impression of surveillance among employees, threatening an employee with futility

_____

[1]The Company filed objections to the election with the Board. Kentucky Tenn. Clay Co., 295 F.3d at 439. The Board overruled the objections and certified the Union as the collective bargaining representative. Id. at 440. In response, the Company refused to recognize and bargain with the Union, prompting the Board to order the Company to do so and to apply for enforcement of that Order with this court. Id. Finding that the Company's objections were meritorious, this court set aside the Board's Order and denied enforcement of it. Id. at 446.

[2]When the ALJ issued his decision, this court had not yet invalidated the election.

4

in selecting union representation and threatening an employee with discipline for engaging in protected concerted activity, and that it had violated § 8(a)(3) by reducing an employee's hours and, later, discharging him.[3]

The following findings of fact made by the ALJ and adopted by the Board form the bases of the § 8(a)(1) and (3) violations found by the Board. Coley Lamar Wilson and Scott worked in the maintenance shop at the Langley facility. Although they generally worked on separate projects, they worked together when a particular project required two men. Wilson, who had been a supervisor in the maintenance shop at one time, trained Scott. Wilson described Scott as a "proficient welder" and a "good worker" and requested

_____

[3]The ALJ based his findings that the Company had violated §§ 8(a)(1) and (3), in part, on the Company's antiunion animus as demonstrated by a § 8(a)(5) violation, namely, its refusal to recognize and bargain with the Union. The Company argues that the ALJ's finding of antiunion animus is too interwoven with that reversed finding of a § 8(a)(5) violation to be severable. Therefore, according to the Company, the § 8(a)(1) and (3) violations must be reversed as well.

We are unpersuaded by this argument. In making its findings, the Board acknowledged this court's decision to set aside certification of the Union. Based on that decision, the Board reversed the ALJ's finding that the Company had violated the Act by refusing to recognize or bargain with the Union. The Board neither adopted nor relied on that finding as evidence of antiunion animus for the purpose of establishing violations of §§ 8(a)(1) and (3). Nor do we. In reviewing the Board's determination, we do not consider the Company's refusal to recognize or bargain with the Union at all. As discussed below, based on the record before us and the Company's virtually exclusive reliance for its arguments on the testimony of a single, discredited witness, we conclude that substantial evidence exists to support the Board's findings.

Scott's assistance on jobs that required two workers. Murray Penner supervised both Scott and Wilson.

During the month leading up to the March 15, 2000 representation election, Scott and Wilson wore pro-Union buttons displaying the phrase "Vote Yes" every day. Scott wore his button on an outer garment, pinning it either on his jacket or shirt pocket. During that same time period, Penner met with Scott and Wilson on a daily basis. Myron Renew, an employee and the subsequent Union president, observed Scott wearing the button on one occasion when Penner approached. Penner came within three feet of Scott and had a clear view of the button. Scott also discussed the Union with other employees and solicited authorization cards for the Union.

The day after the representation election, Penner approached Renew and claimed that "there would be no union." J.A. 427. Penner further stated "[t]hat he would do everything possible to decertify the union, and that there would be an appeal for an election [the following] March." Id. Shortly thereafter, Penner asked Wilson how Wilson thought a union could help him.

In April 2000, Penner interviewed Adelbert Quackenbush for a position with the Company. During the interview, Penner informed Quackenbush that the Union had been voted in. After Quackenbush stated that he might not join the Union, Penner replied that he "hoped [Quackenbush] wouldn't join the Union." J.A. 427.

In August 2000, Penner informed Scott that he intended to reduce Scott's work hours to forty hours per week from fifty to fifty-five hours per week.[4] As justification for implementing the reduction, Penner cited Scott's slow work pace. Specifically, Penner mentioned Scott's failure timely to complete work on an earth-moving machine known as a scraper. Penner also told Scott "that he was going to ruin [Scott's] lifestyle. And if [Scott] didn't like what he was doing, [Scott] could find someplace else to go." J.A. 427. Scott testified that Penner had prolonged the work on the scraper by requesting additional modifications, and that Scott had rebuilt a dump truck and assisted Wilson during that same time period. Furthermore, Scott testified that he had performed his work in the same manner prior to the Union campaign, and that Penner had never criticized him for helping Wilson.

In December 2000, Penner held a meeting with Quackenbush, who had become a Union member by that time, and three truck drivers who opposed the Union. Penner related a story to Quackenbush about a facility in Georgia where the employees had voted for the Union and had netted only an eight cent increase in pay from the subsequent negotiations. Penner further stated that if the employees went on strike, he "would fire all the strikers and just rehire." J.A. 428.

---

[4]By this time, the Company's objections to the representation election were pending before the NLRB.

Also in December 2000, a truck driver, believed by Quackenbush to oppose the Union, overheard Quackenbush and Wilson discussing changes that they thought the Union would bring to the facility. Shortly thereafter, Penner told Quackenbush that he had heard that Quackenbush was trying to change the way Penner was doing things in the facility, and that he did not like Quackenbush's interference. Quackenbush admitted to discussing the Union with Wilson but denied trying to change the way things were being done. He told Penner that he knew the source of Penner's information, referring to the truck driver who had overheard his conversation. Penner did not confirm the source of the information.

In January 2001, Renew sent the Company a document listing the officers of the Union. That document listed Scott as a trustee of the Union's board. Renew also caused a copy of the document to be posted on a bulletin board at the facility.

On Thursday, January 11, 2001, Penner assigned Scott to assist an outside contractor working at the facility to service some of the Company's fire extinguishers. Penner told Scott to complete the project and then report back to him.

When the contractor failed to finish the project on Thursday, Scott reported to work at 7:00 a.m. on Friday and continued to assist even though he was not scheduled to work that day. At 8:00 a.m., Wilson informed Scott that Penner was looking for him, and Scott reported to Penner's office. Penner questioned Scott's

8

presence on a day that he was not scheduled to work. Scott explained that he was working on the fire extinguishers and offered to go home. Penner instructed him to do so after finishing what he was doing. Scott understood this instruction to mean that he should complete those fire extinguishers that he had started but not to start any others. Scott also informed Renew that Penner was sending him home and did not want him to finish the fire extinguisher project.

Scott reported to work at his normal time the following Monday, January 15, 2001, and worked until Penner approached him at approximately 4:45 p.m. Penner inquired as to why Scott had not told the contractor that he intended to leave before completing the fire extinguisher project the previous Friday. Scott replied that informing the contractor was Penner's responsibility. This discussion led to an exchange about the Union. Scott told Penner that there was a union, and that Penner had to do as the Union said. Penner replied, "you do not have a Union. You don't have a contract and you have no rights." J.A. 428. Both Quackenbush and Wilson overheard Penner's comment. Penner told Scott to come to his office. Wilson came along at Scott's request. Once inside the office, Penner instructed Scott to clock out and go home. Upon arriving at his home, Scott telephoned Renew to say that something was happening and asked Renew to meet him in the shop the next day.

9

Renew met Scott at the shop the morning of Tuesday, January 16, 2001. When David Forrester, the plant manager arrived, he informed Renew that Renew could be in trouble for having spent work time waiting. Renew told Forrester that he was present in his capacity as a grievance representative on behalf of Scott.

Scott was called to meet with Penner and Forrester, and he was permitted to bring one witness; he chose Renew. After a brief exchange, Scott was instructed to go home and to return at 1:00 p.m. Scott returned at 1:00 p.m. and, with Renew present on his behalf, met with Penner and Forrester in Penner's office. Forrester informed Scott that he was terminated. The Company's human resources director had prepared a list of Scott's alleged offenses, which Forrester read aloud. Forrester refused Renew's request for a copy of the list.

The Union subsequently filed charges against the Company that resulted in the complaint being issued by the Board General Counsel. Adjudication of that complaint led to the Decision and Order that the Board now seeks to enforce, and that the Company opposes.

## II.

We note at the outset the level of deference due the Board's Decision. We must affirm rational Board interpretations of the Act if they are consistent with the Act. Consolidated Diesel Co. v.

10

NLRB, 263 F.3d 345, 352 (4th Cir. 2001).  Likewise, we must affirm the Board's findings of fact if, considering the record as a whole, substantial evidence supports them.  29 U.S.C. § 160(e) (1998); NLRB v. Air Contact Transp. Inc., 403 F.3d 206, 210 (4th Cir. 2005).  For mixed questions of law and fact, this same substantial evidence standard applies so long as the Board's legal interpretations are valid.  Id.  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  If such evidence exists, we must uphold the Board's decision even though we might have reached a different result had we heard the evidence in the first instance."  Id. (internal quotation marks omitted)(citations omitted).  When the Board's findings of fact rest upon the ALJ's determinations of witness credibility, this court will defer to those determinations absent exceptional circumstances.  WXGI, Inc. v. NLRB, 243 F.3d 833, 842 (4th Cir. 2001).  "Exceptional circumstances include those instances when a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all."  Id. (internal quotation marks omitted).

With these principles in mind, we turn to the specific § 8(a) violations found by the Board.

11

The Board found that the Company violated § 8(a)(1), which makes it "an unfair labor practice for an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7."[5] 29 U.S.C. § 158(a)(1) (1998). Specifically, the Board found the following § 8(a)(1) violations: (1) Penner's statement to Quackenbush and the three truck drivers threatened them with discharge if they went on strike; (2) Penner's statement to Quackenbush that he had heard that Quackenbush was trying to change the way things were done at the facility created the impression of surveillance among the employees; (3) Penner's statement to Scott to the effect that Scott had no union, no contract and no rights threatened futility in selecting union representation; and (4) Forrester's statement to Renew that he could be in trouble for having spent work time waiting for Forrester on January 16, 2001, threatened discipline for engaging in protected concerted activity.[6]

---

[5]Section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157 (1998).

[6]The Company argues that none of these statements violated § 8(a)(1) because, it contends, none of them were motivated by antiunion animus. This averment does not support its denial of the violations because "[u]nlike violations of § 8(a)(3), an employer's antiunion motivation is not a required element of § 8(a)(1)." Medeco Sec. Locks v. NLRB, 142 F.3d 733, 747 (4th Cir. 1998).

In assessing whether a § 8(a)(1) violation has occurred, we focus not on whether the employer's conduct was actually coercive but on whether, under the totality of the circumstances, that conduct reasonably may have tended to coerce or intimidate employees. Medeco Sec. Locks v. NLRB, 142 F.3d 733, 745 (4th Cir. 1998). Because of the Board's specialized experience in this area, we grant its assessment of whether conduct reasonably tends to coerce or intimidate employees considerable deference. Id.

We consider the Company's arguments regarding each of the violations found by the Board in turn.

1.

With respect to Penner's statements to Quackenbush regarding firing strikers, the Company disputes Quackenbush's version of the events. Quackenbush stated that Penner informed him and others during a meeting that if employees went on strike, he "would fire all the strikers and just rehire." J.A. 428. According to Penner's testimony, during a safety meeting held on the shop floor, he responded to a specific question regarding what would happen in the event of a strike as follows: "[W]e as a Company have an obligation to our customers to meet their needs, and if it actually came down to that, that we would be obligated to replace workers if needed." J.A. 186.

13

In finding that Penner threatened to fire the employees if they went on strike, the ALJ credited the testimony of Quackenbush over that of Penner. This he was permitted to do, and because the record reveals no "exceptional circumstances" that would lead us to disturb that credibility determination, we must defer to his decision.

The Company argues that such "exceptional circumstances" do exist because the ALJ credited Quackenbush's testimony over that of Penner without explanation. This is incorrect. The ALJ had already stated that it did not find Penner to be a credible witness. J.A. 427.

The Company complains that the ALJ based his credibility determination on a single incident, Penner's testimony that he could not specifically recall seeing Scott wearing a "Vote Yes" button prior to the representation election, and argues that the ALJ should have "engage[d] in individualized determinations regarding credibility as to each distinct issue." Respondent's Br. at 16. The Company misstates Penner's testimony, misrepresents the ALJ's findings and misapprehends the concept of credibility. Penner did not testify that he "could not specifically recall" seeing Scott wear a "Vote Yes" button, as suggested by the Company's brief. Rather, Penner testified that although he saw some employees wearing "Vote Yes" buttons, Scott <u>never</u> wore such a button. J.A. 185, 224. Moreover, in finding that Penner lacked

14

credibility as a witness, the ALJ cited more than his belief that Penner was not truthful with respect to that issue; he also noted that Penner appeared to be "reaching" in an attempt to portray Scott as a poor employee. J.A. 427. Credibility is a witness-specific, not an issue-specific, characteristic. We can discern no reason why the ALJ should be required to ignore his perception that Penner had been untruthful at other points in his testimony in assessing Penner's veracity with respect to the events involving Quackenbush.

Finally, the Company contends that the statement made by Penner was not unlawful. Citing Grinnell Fire Prot. Sys. Co. v. NLRB, 236 F.3d 187, 201 (4th Cir. 2000), the Company argues that it is legal to inform employees of an intention to hire permanent replacements in the event of a strike. Thus, according to the Company, Penner's statement could not be considered coercive.[7]

Although the Company's characterization is correct as far as it goes, the extent to which it is incomplete is made manifest by the very case on which it purports to rely. In Grinnell, the employer sent a letter to its employees informing them that it was implementing its final contract offer, and that in the event of a

_____

[7]An employer's coercive action affects protected rights whenever it can have a deterrent effect on a protected activity such as a strike or refusal to work to protest wages or working conditions. See Medeco Sec. Locks, 142 F.3d at 745. "This is true even if an employee has yet to exercise the right protected by the Act." Id.

15

strike it would hire permanent replacement workers.  Id. at 201 n.16.  The ALJ found, and this court agreed, that, because the strike was for unfair labor practices, Grinnell's letter was coercive because it implied that the employees could be replaced for engaging in protected activity.  Id. at 201.  Specifically, "Grinnell's letter was threatening because it did not specify that Grinnell could hire permanent replacements only in the event of an 'economic' strike."[8]  Id. (emphasis added).

Similarly here, we must affirm the Board's finding that Penner's statement was unlawful because, like the letter in Grinnell, it implied that the strikers could lose their jobs on a permanent basis without qualification.  The statement failed to distinguish, as it must, between an "economic" strike, in which an employer can hire permanent replacements, and an "unfair labor practice" strike, in which the employees retain the right to reinstatement.

2.

The Company next argues that, even accepting Quackenbush's version of the incident wherein Penner stated that he had heard Quackenbush was trying to change the way Penner was doing things in

---

[8]Strike activity initiated in whole or in part in response to an employer's unfair labor practice constitutes an unfair labor practice strike.  Pirelli Cable Corp. v. NLRB, 141 F.3d 503, 515 (4th Cir. 1998).  Strike activity not initiated in response to an unfair labor practice constitutes an economic strike.  Id.

the facility as true, Penner's statement did not create an impression of surveillance. It contends that the ALJ's findings establish that Penner's information was not acquired through a campaign of union surveillance but from a truck driver who overheard Quackenbush's conversation.

It is well established that a single conversation can violate § 8(a)(1) as long as that conversation gives an employee the impression that the employer has conducted surveillance of protected activities. NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1045 (4th Cir. 1997). "The employer's statement[s] need only contain sufficiently specific information to convey the impression that the employer or its agents has conducted union surveillance." Id. at 1046. Here, Quackenbush and Wilson engaged in a private conversation about potential changes associated with the Union's presence. Penner's comments suggested that he was aware of the specific details of that conversation. The fact that the source of Penner's knowledge may have been another employee does not eliminate the impression of Company surveillance carried out indirectly through other employees acting on the Company's behalf. Given the considerable deference due the Board's assessment of whether conduct reasonably tends to coerce or intimidate employees, we affirm its finding on these facts.

3.

The Company further disputes the sequence of events in the ALJ's findings of fact with respect to the conversation during which Penner told Scott "you do not have a Union. You don't have a contract and you have no rights." As the Company would have it, when Scott told Penner that Penner had to do as the Union said, Penner's reply was to the effect that the presence of the Union would not alter Penner's position or responsibilities. At that point, Scott, claiming that he had a right to a witness, demanded that Quackenbush witness the conversation. Only then, according to the Company, did Penner tell Scott that Scott had no union, no contract and no rights. The Company argues, in other words, that Penner's statement was merely intended to inform Scott that, given the invalidity of the Union's election, Scott had no right to a witness.

Even if we were to accept the Company's post-hoc version of the events, there is nothing in the record to suggest that Scott should have understood the meaning the Company now attributes to Penner's statements. The relevant question for the Board was not whether Penner was technically correct in asserting that Scott had no union, but whether, under the totality of the circumstances the statement reasonably may have tended to coerce or intimidate Scott. See Medeco Sec. Locks, 142 F.3d at 745. The Board found that it

18

did, and the Company proffers no compelling reason for us not to defer to this finding.[9]

4.

The Company argues that Forrester's statement that Renew could be in trouble for having spent work time waiting for Forrester was lawful because there was no validly elected union at the facility. Again, the Company contends that the ALJ's finding of a § 8(a)(1) violation was based on the erroneous assumption that the Union had won the election. According to the Company, Renew was not threatened for engaging in a protected activity because the lack of a validly elected Union necessarily meant the lack of a grievance procedure or the right to grievance representatives.

---

[9]The Company also seems to argue that Penner did not make the statement attributed to him. It complains that the ALJ failed to explain why he disregarded Penner's denial that he threatened futility, relying instead on the testimony of Scott, Quackenbush and Wilson. It further points out that both Quackenbush and Wilson admitted that they did not hear the entire conversation, and that Quackenbush's testimony conflicted with that of Wilson.

This argument as well founders on the shoals of Penner's credibility. The ALJ could and did reasonably rely on the testimony of Scott, as corroborated by Quackenbush and Wilson. It does not matter that the two did not hear the entire conversation; they generally consistently corroborated Scott's account of the relevant portion. Moreover, the Company points to nothing in the record to suggest that Penner denied making the statement in question. In fact, Penner was never asked about the statement. He merely denied that he threatened futility. The Company posits no exceptional circumstances that would justify disregarding the ALJ's credibility determination in this regard.

19

Substantial evidence supports the Board's conclusion that Forrester's statement violated § 8(a)(1). As explained in Part II.A.3., the Board's finding of a § 8(a)(1) violation was not based on the assumption that the Union had won the election. In any event, the status of the Union at the time of Forrester's statement was irrelevant because the Act protects an employee's right to engage in "concerted activities," not "union activities." "[T]he 'concerted activities' protected by the [A]ct are not limited to cases where the employees are acting through unions or are otherwise formally organized. It is sufficient that they are acting together for mutual aid or protection." Joanna Cotton Mills Co. v. NLRB, 176 F.2d 749, 752 (4th Cir. 1949).

Although the Company characterizes Forrester's statement as a "reminder," it does not dispute the ALJ's finding that Forrester told Renew that Renew could be in trouble for having spent work time waiting for Forrester to arrive. Moreover, based on the testimony of both Forrester and Renew, Forrester made the statement in response to Renew's assertion that he was there to represent Scott. J.A. 133, 286. Under those circumstances, the evidence is adequate to support the Board's conclusion that the statement was a threat of discipline for engaging in a concerted activity.

In addition to the § 8(a)(1) violations, the Board found that, by reducing Scott's work hours and discharging him, the Company had violated § 8(a)(3), which makes it "an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ." 29 U.S.C. § 158(a)(3) (1998). In doing so, the Board employed the following two-step, burden-shifting analysis proposed in NLRB v. Wright Line, Inc., 662 F.2d 899 (1st Cir. 1981), and approved by the Supreme Court in NLRB v. Transportation Mgmt. Corp., 462 U.S. 393, 394 (1983): First, the General Counsel bears the burden of making a prima facie case that antiunion animus motivated the employer's adverse employment action by showing "(1) that the employee was engaged in protected activity, (2) that the employer was aware of the activity, and (3) that the activity was a substantial or motivating reason for the employer's action." FPC Holdings, Inc. v. NLRB, 64 F.3d 935, 942 (4th Cir. 1995). Then, if the General Counsel successfully makes a prima facie case, the employer may present the affirmative defense that it would have taken the same action even in the absence of the employee's engagement in the protected activity. Id.

The Company does not dispute that Scott engaged in protected activity but argues that the General Counsel failed to show the

21

second and third prongs of the prima facie case, namely, that the Company was aware of Scott's activity, and that Scott's activity was a substantial or motivating reason for its actions. It also argues that, even assuming that the General Counsel had made a prima facie case, it proved that its actions were for legitimate business reasons. We consider each of these arguments in turn.

1.

With respect to the Company's awareness of Scott's activities, it claims that there was no evidence that Penner saw Scott wearing a "Vote Yes" button or knew what the button meant, and that Renew's allegation that he sent the Company a document naming Scott as a trustee of the Union was unsupported.

Again, the question of whether Penner saw the "Vote Yes" button is one of credibility. As we have set forth in detail, given the contradictions between the testimony of Penner, on the one hand, and that of Scott, Wilson and Renew, on the other, the ALJ made a facially legitimate credibility determination. On this record, we find no "exceptional circumstances" that would compel us to reject the ALJ's decision to credit the testimony of Scott, Wilson and Renew over that of Penner.

The Company's suggestion that Penner did not know what the "Vote Yes" button meant is also without merit. The buttons were worn in the weeks leading up to a closely contested union election

22

in a facility that had no union at that time.  Penner conceded that he saw some employees wearing the buttons and specifically noted that "Myron Renew wore his proudly."  J.A. 224.  Substantial relevant evidence exists in the record to support the conclusion that Penner saw Scott wearing the "Vote Yes" button and knew that the button was intended to support selection of the Union as the representative of the employees.

Whether Renew sent the Company a document naming Scott as a trustee of the Union and caused that document to be posted on a Company bulletin board is also a question of witness credibility. The Board General Counsel introduced into evidence a document dated January 5, 2001 that identified the Union officers, including Scott.  Renew testified that he had sent a copy of the document to Forrester on that date, and that another member of the Union had posted the document on the Company bulletin board.  Forrester denied ever having seen the document.  The ALJ credited Renew's testimony.  Again, we find no "exceptional circumstances" that compel us to reject that decision.

Finally, the documented events leading up to Scott's discharge, including the exchange between Penner and Scott regarding the Union, Scott's request to have Renew represent him at the meeting with Penner, and Renew's interaction with Forrester, all belie the Company's assertion regarding Penner's lack of awareness of Scott's union involvement.  To the contrary, this

23

evidence supports the Board's finding that the Company was aware of Scott's engagement in a protected activity.

Substantial evidence also supports the Board's finding that Scott's engagement in a protected activity was a motivating reason for the reduction in Scott's work hours and his discharge in violation of § 8(a)(3).

"Motive may be demonstrated by circumstantial as well as direct evidence and is a factual issue which the expertise of the Board is peculiarly suited to determine." FPC Holdings, 64 F.3d at 942 (internal quotation marks omitted) (citations omitted). Here, the ALJ cited the § 8(a)(1) violations as evidence of the Company's antiunion animus. Such violations may indeed be evidence of antiunion animus, even where the subject of the § 8(a)(3) violation is not the same individual as the subject of the § 8(a)(1) violation. NLRB v. Grand Canyon Mining Co., 116 F.3d 1039, 1048 (4th Cir. 1997). The timing of an adverse employee action can also support a finding of antiunion animus. Id. The Company discharged Scott the day after he and Penner had a heated discussion about the Union. And finally, Penner's statements and actions involving Renew, Wilson and Quackenbush, set forth above, also evince an antiunion animus supporting the Board's finding that Scott's engagement in a protected activity was a motivating reason for his reduction in hours and ultimate discharge.

24

Once the General Counsel makes a prima facie case that antiunion animus motivated the employer's decision to take the adverse employment action, the employer may present the affirmative defense that it would have taken the same employment action even absent antiunion animus. Medeco Sec. Locks, 142 F.3d at 742. If the Board finds, however, that the employer's stated reason for taking the employment action is pretextual, "we must affirm the Board if substantial evidence supports this factual determination." Id.

Here, the Company alleges a litany of performance problems as the basis for the reduction in Scott's hours and his eventual discharge. Specifically, it alleges that Penner reduced Scott's hours because Scott failed to complete his work, including the work on the scraper, in a timely manner. The company also identifies four documented performance problems and testimony regarding other performance and disciplinary issues as support for its position that Scott's discharge was for legitimate reasons.

Substantial evidence supports the Board's finding that the Company's stated reasons for reducing Scott's hours and discharging him were pretextual. The ALJ credited Scott's testimony that he had performed his work in the same manner both before and after the Union campaign, but was only penalized for his performance after the campaign. In doing so, the ALJ noted the lack of documentation to

substantiate Penner's testimony concerning the deficiencies in Scott's performance on the scraper job. The ALJ also credited the testimony of Wilson, a former supervisor at the facility, that Scott was a good worker. Finally, the ALJ noted that Penner's threat that he was going to ruin Scott's lifestyle by reducing his hours was "consistent with a broader agenda than merely correcting an employee for working too slow." J.A. 429. This evidence is sufficient to support the Board's conclusion that antiunion animus motivated Penner's decision to reduce Scott's hours.

The same evidence also supports the Board's finding of a violation with respect to Scott's discharge. Moreover, that discharge occurred in the wake of both a heated discussion about the Union between Penner and Scott, during which Penner told Scott that he had no union, no contract and no rights, and Forrester's threatening statement to Renew concerning potentially being in trouble for waiting to represent Scott. According to even Forrester's testimony, Scott was subsequently discharged without being asked for an explanation of his side of the incident that led to the discharge, in apparent violation of Company policy. Finally, the four documented performance problems referred to by the Company occurred over a twenty-month period, with the last documented incident occurring approximately six months before Scott's discharge. On this record, we are constrained to uphold the Board's Decision.

III.

For the foregoing reasons, we grant the Board's application for enforcement.

APPLICATION FOR ENFORCEMENT GRANTED